Filed 5/25/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARNOLD LEHMAN,<br><br>    Defendant and Appellant. | A144800<br><br>(Contra Costa County<br>Super. Ct. No. 5-131285-9) |

Defendant Arnold Lehman was found guilty of committing dozens of sex offenses against his granddaughters, Jane Doe 1 and Jane Doe 2. In a prior appeal, we reversed three of defendant's convictions and affirmed the judgment in all other respects. Defendant now appeals from an order awarding a total of $1 million in noneconomic restitution to Jane Doe 1 and Jane Doe 2. We affirm.

**BACKGROUND**

Defendant was charged by information on June 28, 2013. As to Jane Doe 1, defendant was charged with 31 counts of committing a lewd and lascivious act against a child under the age of 14 (Pen. Code,[1] § 288, subd. (a), counts 1 to 31); 12 counts of committing a lewd and lascivious act against a child age 14 to 15 (§ 288, subd. (c)(1), counts 32 to 43), two counts of oral copulation of a minor (§ 288a, subd. (b)(1), counts 44 & 47), and four counts of sexual penetration of a minor[2] (§ 289, subd. (h), counts 45, 46, 48 & 49). As to Jane Doe 2, defendant was charged with two counts of committing a

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] In the June 28 information, counts 46 and 49 charged defendant with sodomy of a minor in violation of section 286, subdivision (b)(1). The charges were amended during trial to charge sexual penetration of a minor.

lewd and lascivious act against a child under 14 (§ 288, subd. (a), counts 50 & 51). It was further alleged that defendant was eligible for a sentencing enhancement under section 667.61, subdivision (j)(2), because he committed an offense against more than one victim.

Jane Doe 1 and Jane Doe 2 are half sisters. Defendant is their grandfather. Shortly after Jane Doe 2 was born in June 2001, her family moved to Brentwood. Jane Doe 1 was about eight years old at the time. The family's Brentwood home was owned by defendant, and he visited often.

Jane Doe 1 testified that, when she was nine or 10 years old, defendant would give her back rubs. The back rubs occurred every time defendant visited, and they made Jane Doe 1 uncomfortable. When Jane Doe 1 was 10 or 11, defendant began massaging Jane Doe 1's front and chest. After Jane Doe 1 started wearing a bra, defendant would rub underneath the bra or push it up. Defendant would ask Jane Doe 1 if he could take off the bra, and she would say "no." Defendant would touch Jane Doe 1's breasts for 20 or 30 minutes.

When Jane Doe 1 was in seventh or eighth grade, defendant began moving his hands toward her pant line when he touched her. He also kissed her stomach, chest area, and lips. At defendant's request, Jane Doe 1 would lie down as he touched her. Jane Doe 1's younger brother testified that he once saw defendant and Jane Doe 1 lying on the floor kissing. When Jane Doe 1 was 14 or 15, defendant put his hands "underneath the pant line." Defendant would take off Jane Doe 1's pants and underwear and put his fingers inside her vagina. Jane Doe 1 could not recall exactly how often this happened, but she testified it occurred "every time [defendant] was over."

The touching continued when Jane Doe 1 was 16 and 17 years old, but eventually stopped towards her "later years of high school." Jane Doe 1 did not tell anyone in her family about defendant's conduct while it was ongoing. She testified she was afraid her family would not believe her. Jane Doe 1 eventually disclosed defendant's conduct to a college friend in 2012. Jane Doe 1 told her mother in or around December of that year, and the matter was reported to the police in February 2013.

Jane Doe 2 was 12 years old when she appeared at trial in October 2013. She testified that in or around 2012 her grandfather rubbed her back, and the back rub "felt weird." She eventually asked him to stop. Two weeks later, defendant rubbed Jane Doe 2's back underneath her clothes. Jane Doe 2 asked him to stop, and he did so. Jane Doe 2 testified there may have been other incidents, but she was not sure. Jane Doe 2 said defendant "mostly" touched her neck, but sometimes he would go lower, down to her waist.

Jane Doe 2's brother testified: "Every time [defendant] was around [Jane Doe 2], he always seemed to want to put his hand on her like giving her back rubs and such. [¶] And I remember she always acted like just disgusted every time it happened, and she would just kind of squirm out of his touch." Jane Doe 2's friend Alex also witnessed one of defendant's back rubs. Alex stated defendant rubbed Jane Doe 2's back as he repeated her name softly. According to Alex, Jane Doe 2 looked "weirded out."

A jury found defendant not guilty of counts 1 and 7 (committing a lewd and lascivious act against a child under the age of 14); guilty of misdemeanor battery as a lesser offense on counts 17, 19, 22, 24, 28, 31, 46, and 49; and guilty as charged on the remaining counts. Defendant filed a motion for a new trial, which was denied. The trial court sentenced defendant to an indeterminate term of 40 years to life, as well as a determinate term of 12 years.

At the sentencing hearing, Jane Doe 1 testified as follows: "I looked up to you [defendant] growing up, looked up to your caring nature. My trust was misused, and I had to learn at a young age to watch my back. And likewise in response I decided to get good grades and move away quickly. My motivation to move away from home gives me my voice. Every day is a challenge. I have to wake up to the reality that I feel gross, dirty, and unloveable. No matter what I do, that will not erase that pain. [¶] And I do get to counseling weekly, but the hardest thing . . . to say is I do forgive you, but I will never condone your actions. [¶] Currently, I'm doing great in college, which I never thought was possible. I used to conduct a weekly Bible study, and I possess a management level job while being a student. And I have learned how to enjoy life for the first time. [¶]

Growing up this crippled my life, but this act will no longer stop me or hold me back from life to enjoy what is in store for me."

In September 2014, the district attorney filed a brief requesting restitution for Jane Doe 1, Jane Doe 2, and their family. The district attorney sought $931 in connection with money spent by Jane Doe 1 as a result of the defendant's abuse, as well as $4.9 million for noneconomic losses—$4.7 million for Jane Doe 1 and $200,000 for Jane Doe 2. The DA also sought $132,074 in economic damages for Jane Doe 1 and Jane Doe 2's mother. In the prosecution's papers, the district attorney submitted civil "jury verdict" reports indicating a range of noneconomic damages for child molestation victims 14 years old or younger and similar awards to victims between four and 17 years old. The documents reflect damage awards ranging from $12,500 to $30 million. The prosecution also submitted court decisions awarding noneconomic damages in particular criminal prosecutions in Contra Costa County Superior Court: in *People v. Plaza-Dela Calzada,* the general damages awarded were $900,000 for Jane Doe II and $250,000 for Jane Doe I;[3] in *People v. Barriere*, the award was $1 million;[4] and in *People v. Blake*, a case in which Judge Kennedy presided, the total noneconomic damage award for four male victims was $1.6 million.[5] Defendant opposed the restitution request, arguing among other things that noneconomic losses could not be recovered absent proof the victims actually suffered such losses.

After each side submitted their written briefs on the issue, the court scheduled the hearing on restitution for February 20, 2015. When counsel appeared for the hearing, the trial court announced the hearing procedure. "Based on our brief discussions in chambers, my understanding is that it's *the agreement of the parties* that counsel will argue some . . . or any of the issues that they wish to argue this morning, and *then I'll allow supplemental briefing.* [¶] And then based on the supplemental briefing, I will take

---

[3] This was a case tried in 2011 before Judge Flinn.

[4] This was a case tried in 2011 before Judge Canepa.

[5] This was a case tried in 2014.

4

the matter under submission and issue a written decision after I receive the written briefing. [¶] If before the date we agree upon for the written briefing, *either side determines that they would like to request an additional hearing, then you can notify each other and call and check to make arrangements to set a hearing date.*" (Italics added.) The trial judge then indicated his ruling would include the briefings along with the following: "I have reviewed the presentence report, and of course I have the testimony from the trial. . . . I have transcripts available and my notes from the trial that I will review *in connection with these issues.*" (Italics added.) In other words, the court made it clear to the attorneys what it was going to consider in resolving all issues of restitution, including noneconomic damage questions. At the hearing, neither side objected to this process nor did defendant seek further hearing before the trial court prior to submitting the issue of restitution. The trial court eventually awarded Jane Doe 1 $931 for economic losses and $900,000 for noneconomic losses. Jane Doe 2 was awarded $100,000 for noneconomic losses, and the rest of the family received nothing.

## DISCUSSION

Defendant argues the prosecution failed to make a prima facie case for noneconomic restitution, the trial court's findings were unsupported by the evidence, the prosecutor lacked authority to request noneconomic restitution on behalf of Jane Doe 1 and Jane Doe 2, and the trial court erred by failing to state how it calculated noneconomic restitution. We find all of these arguments unavailing.

Pursuant to the California Constitution, victims of crime have a right to restitution from criminal defendants: "Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B).) To effect this constitutional requirement, the Legislature enacted section 1202.4, which requires the trial court to order a defendant to pay victim restitution "in an amount established by court order, based on the amount of loss claimed by the victim . . . or any other showing to the court." (§ 1202.4, subd. (f).) Recoverable losses include the value of stolen or damaged property (§ 1202.4, subd. (f)(3)(A)), medical expenses (§ 1202.4, subd. (f)(3)(B)), mental health

5

counseling expenses (§ 1202.4, subd. (f)(3)(C)), and lost wages or profits (§ 1202.4, subd. (f)(3)(D)–(E)).  Pertinent to this case, victims may also recover "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288."  (§ 1202.4, subd. (f)(3)(F).)

"A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious.  [Citation.]  No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered.  ' "[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt." ' "  (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542.)

In considering restitution awards for *economic* losses, it has been held that "a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss."  (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.)  "Section 1202.4 does not, by its terms, require any particular kind of proof.  However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property.  [Citations.]  Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim.  [Citation.]  The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the repair or replacement cost of damaged or stolen property."  (*People v. Gemelli*, *supra*, 161 Cal.App.4th at p. 1543.)

In evaluating awards of restitution for *noneconomic* losses, courts have looked to civil law for guidance.  (*People v. Smith* (2011) 198 Cal.App.4th 415, 436 (*Smith*).)  The Civil Code provides noneconomic damages are for "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation."  (Civ. Code, § 1431.2, subd. (b)(2).)  " 'No fixed standard exists for

6

deciding the amount of these damages. [In a civil trial, a jury] must use [its] judgment to decide a reasonable amount based on the evidence and . . . common sense.' (CACI No. 3905A (2009 ed.).) . . . An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury. [Citation.] [¶] The obvious difference between the review of a civil award of noneconomic damages and a criminal restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance. Even with that difference in mind, [there is] no reason to adopt any other standard of review." (*Smith*, at p. 436.)

In *Smith*, the Third Appellate District affirmed an award of $750,000 for noneconomic restitution after the defendant was convicted of one count of committing a lewd act on a child under 14 and one count of continuous sexual abuse. (*Smith*, *supra*, 198 Cal.App.4th at pp. 419–420.) The defendant, who dated and then married the victim's mother, began molesting the victim when she was eight years old. (*Id.* at p. 420.) The defendant would touch the victim's chest, stomach, neck, and back, over and under her clothing. (*Ibid.*) Doe recalled the molestation occurred " 'basically every day' " she was alone with the defendant. (*Id.* at p. 421.) The defendant began orally copulating the victim when she was 14 years old, and began penetrating her vagina with his penis when she was 16. (*Ibid.*) The defendant continued having sexual relations with the victim after she moved out of the house until she was 26 years old. (*Ibid.*) Evidence introduced at the restitution hearing showed the defendant isolated the victim and took advantage of a position of trust from the time she was eight years old. (*Id.* at p. 432.) It also showed the victim still had nightmares and flashbacks concerning the abuse, was in therapy to deal with problems associated with the abuse, had difficulty keeping jobs, had not finished her education, and had twice attempted suicide. (*Id.* at p. 432.) The trial court arrived at $750,000 in noneconomic damages by multiplying the defendant's 15 years of abuse by $50,000 per year. (*Id.* at p. 433.) On appeal, the trial court rejected the defendant's argument that the award did not meet the requirements applied to economic

7

damages, reasoning: "The standard for awarding economic damages, which by their nature are more definite, cannot be used to challenge an award of noneconomic damages." (*Id.* at p. 435.)

In this case, the trial court found Jane Doe 1 was entitled to $900,000 in noneconomic restitution because of the psychological impact of defendant's abuse. The court explained: "Even after she was able to free herself of repeated severe abuse, Jane Doe I has had to carry the memories, the betrayal from her grandfather, and the resulting scars for the rest of her life. In her testimony at trial and her statements at sentencing, Jane Doe I described the emotional pain she suffered at the hands of the Defendant and its impact on her life through the present. The pain she endured in reliving these events was palpable. It is clear that Jane Doe I has found the courage to move on with her life despite the memory of these events. Her success in doing so does not diminish the psychological harm she suffered at the hands of the Defendant . . . . [¶] Although it is impossible to know the extent to which the defendant's abuse of Jane Doe I has impacted the remainder of her life, no one can reasonably contest that the defendant's long-term and extensive molestation of Jane Doe I caused her immeasurable psychological harm. Jane Doe I has suffered the effects of the defendant's abuse for her entire life, and will continue to suffer for the remainder of her life."

The trial court found Jane Doe 2 was entitled to $100,000 for psychological harm, explaining: "Jane Doe II suffered only the early stages of the Defendant's grooming behavior before he was stopped by Jane Doe I's revelation of his conduct. Even as a young child, Jane Doe II knew the Defendant's conduct was 'weird' and 'creepy' and made her uncomfortable. Jane Doe II also now knows . . . that the Defendant's unwelcomed touching was motivated by his sexual interest in her. She is aware that the Defendant began molesting her older sister the same way and was likely grooming her for years of abuse. [¶] In her testimony, Jane Doe II was visibly distraught. She attributed her emotional breakdown to the fact that the Defendant had abused her sister in the same way and that she had to discuss the harm her family had suffered as a result of the Defendant's conduct. These are manifestation of the psychological harm the Defendant

8

caused Jane Doe II to suffer because of his conduct against her, his conduct against her sister, and the resulting devastation to the family."

Defendant now argues the prosecution failed to make a prima facie showing of Jane Doe 1's and Jane Doe 2's noneconomic losses. Neither victim submitted a declaration or testified at the restitution hearing. Nor did the prosecution present expert testimony at the hearing concerning the impact of defendant's abuse. Instead, the prosecution presented restitution orders from other cases. Defendant argues the trial court must have inferred the victim's pain and suffering from the nature of their injuries, and it was improper to do so. According to defendant, the restitution award for noneconomic damages was based solely on his criminal conviction and therefore constituted unauthorized punitive damages.

We agree that more evidence could have been provided concerning the victims' noneconomic losses. Nevertheless, we cannot conclude the trial court abused its discretion or that the noneconomic restitution awarded in this case shocks the conscience. Contrary to defendant's arguments, the prosecution was not required to present victim testimony or affidavits or expert declarations in connection with the restitution hearing. As discussed above, section 1202.4 does not require any particular kind of proof to establish a victim's losses. (*People v. Gemelli*, *supra*, 161 Cal.App.4th at p. 1543.) Here, the trial court's restitution award was evidently based on Jane Doe 1's and Jane Doe 2's testimony at trial, Jane Doe 1's statements at the sentencing hearing, and a probation report. This evidence constituted sufficient support for the restitution award, and there is no indication the trial court considered restitution awards from other cases in reaching its decision.

At the sentencing hearing, Jane Doe 1 stated defendant misused her trust and as a result of his actions "[e]very day is a challenge" and she has had to attend weekly counseling. Jane Doe 1 also stated defendant "crippled" her life growing up, she cannot "erase that pain," and she feels "gross, dirty, and unloveable." Moreover, the probation officer reported Jane Doe 1 was working with two different counselors to come to terms with defendant's abuse. Based on this, along with Jane Doe 1's trial testimony and the

9

severity and prolonged nature of defendant's crimes, the trial court reasonably concluded Jane Doe 1 suffered a significant noneconomic loss.

Likewise, trial testimony and the probation report provided a sufficient basis for the trial court's award of noneconomic restitution for Jane Doe 2. As the trial court stated in the restitution order, Jane Doe 2 recognized defendant's conduct was "weird" and "creepy," and it eventually became clear to Jane Doe 2 defendant's actions were motivated by a base intent. The trial court also found Jane Doe 2 experienced an emotional breakdown at trial and, based on her statements, concluded her distress was attributable to defendant's conduct and his devastation of her family. As a reviewing court, we are in no position to second-guess the trial court's factual findings on this point. Moreover, the probation report concluded Jane Doe 2 "is very emotional and just started counseling on her own."

Defendant asserts substantial evidence does not support the trial court's conclusions regarding the emotional pain and psychological harm suffered by the victims and the extent to which defendant's abuse has affected their lives. Defendant appears to suggest any noneconomic restitution award was improper absent expert testimony concerning Jane Doe 1's mental state. Defendant also takes issue with the trial court's references to Jane Doe 1's expression and demeanor at trial, arguing we cannot review findings based on observations that are not part of the record on appeal. As to Jane Doe 2, defendant argues the trial court erred in finding her emotional distress at trial was a manifestation of the psychological harm caused by defendant.

" 'Substantial evidence' means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) In this case, Jane Doe 1's statement at sentencing, her demeanor at trial, the probation report, and evidence concerning her attempts to seek treatment were sufficient to establish her psychological distress, especially considering the extent and severity of defendant's abuse and the fact that defendant did not present any contrary evidence. Expert testimony was not required and the trial court, as the finder of fact,

10

properly considered the demeanor of Jane Doe 1 in rendering its decision. (C.f. *People v. Scott* (2011) 52 Cal.4th 452, 493 ["witness's 'demeanor is always relevant to credibility.' "].) The trial court also had ample grounds for concluding Jane Doe 2's distress at trial reflected the harm caused by defendant's conduct.

Defendant further argues the prosecutor failed to show she had authority to request noneconomic restitution on behalf of the victims. At the restitution hearing, the prosecutor explained: "I had requested documentation from the family a number of times . . . , and what the Court has is what we were able to receive from them." According to defendant, this suggests the victims decided not to seek noneconomic restitution. Defendant reasons that since the victims only submitted information supporting the recovery of economic restitution, that is all they wanted. We are not convinced. That the victims declined to submit a demand for a specific amount of noneconomic restitution does not mean they did not wish to seek such restitution. Nor does the law require victims to formally submit such a demand. Pursuant to section 1202.4, a court shall order restitution "in every case" in which a defendant has suffered a loss. (§ 1202.4, subd. (f).) The award must be "based on the amount of loss claimed by the victim or victims *or any other showing to the court.*" (*Ibid.*, italics added.) We also observe there is a significant difference between economic losses, which can be readily calculated by a victim, and noneconomic losses, for which no fixed standard exists.

Finally, defendant argues the trial court erred by failing to state how it calculated the amount of noneconomic restitution. In one of the cases cited by defendant, *People v. Frey* (1989) 209 Cal.App.3d 139, a restitution order was reversed where the trial court failed to specify the exact amount of the restitution fine and did not identify the losses to which the fine pertained. (*Id.* at p. 142.) The same cannot be said here. The two other cases cited by defendant, *People v. Giordano* (2007) 42 Cal.4th 644, and *People v. Jones* (2010) 187 Cal.App.4th 418, relate to the calculation of *economic* losses. But there are significant differences between economic and noneconomic losses, as the latter "require more subjective considerations." (*Smith*, *supra*, 198 Cal.App.4th at p. 436.) Here, the trial court set forth its assessment of the psychological distress suffered by both Jane Doe

1 and Jane Doe 2. As there is no fixed standard for calculating noneconomic losses, it is unclear exactly what more the trial court could have done to explain the basis for the noneconomic restitution award.

## DISPOSITION

The restitution award is affirmed.


_____
DONDERO, J.


We concur:


_____
HUMES, P. J.


_____
MARGULIES, J.

| | |
|---|---|
| Trial Court | Contra Costa County Superior Court |
| Trial Judge | Hon. John Kennedy |
| Counsel for Defendant and Appellant | Beles & Beles<br>Robert J. Beles<br>Anne C. Beles<br>Paul McCarthy |
| Counsel for Plaintiff and Respondent | Kamala D. Harris, Attorney General,<br><br>Gerald A. Engler and Jeffrey M. Laurence, Assistant Attorneys General,<br><br>Laurence K. Sullivan and Moona Nandi, Deputy Attorneys General |