Filed 1/10/23  P. v. Lytle CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CORAL ANNETTE LYTLE,<br><br>    Defendant and Appellant. | A165859<br><br>(Tulare County<br>Super. Ct. No. VCF358009) |

Defendant Coral Annette Lytle pled guilty to numerous sex offenses against two teenage victims.  On appeal, Lytle challenges an order that she pay $100,000 in noneconomic restitution to each victim.  We reject Lytle's contentions that the noneconomic restitution order violated her Sixth Amendment right to a jury trial and that the statute authorizing such restitution violates the federal and state equal protection clauses.  But we find merit in her contention that the court abused its discretion by not stating the method or factual basis it used to calculate the restitution amount.  Accordingly, we will reverse the order for noneconomic restitution and remand for further restitution proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Lytle was 40 years old at the time of the offenses involving M.W. and E.G.  According to the evidence presented at the preliminary hearing, 14-year-old M.W. briefly dated Lytle's teenage daughter.  On several occasions,

Lytle bought cigars and alcohol for M.W. and sent him nude photographs. Often, and even after M.W. and Lytle's daughter stopped dating, Lytle would pick up M.W. from his home while his parents were sleeping and then return him home at 5:00 a.m. Lytle once went to M.W.'s home while his parents were away and performed oral sex on him. On another occasion, they performed oral sex on each other and had vaginal sex in the back of Lytle's car.

Lytle also engaged in sexual relations with 15-year-old E.G., who dated her other daughter. During the first of three incidents, the two engaged in oral sex and unprotected sexual intercourse while in Lytle's car at a park. During the second incident, the two had sexual intercourse in Lytle's parked car on the street. In the third incident, E.G. said he was not interested and had a test the next day, but Lytle urged him on and the two had sexual intercourse in a Walmart parking lot. E.G. stopped these sexual relations because he was friends with Lytle's daughters and had to interact with Lytle's husband, and E.G. felt badly that Lytle was cheating on her family with him. After E.G. broke it off, Lytle sent him nude messages saying he would miss her.

Lytle was charged by information with 21 felony counts, as follows: unlawful sexual intercourse by a person over the age of 21 with a person under the age of 16 (Pen. Code, § 261.5, subd. (d), counts 1 through 4[1]); meeting with a minor for lewd purposes (§ 288.4, subd. (b), counts 5 through 8); contact with a minor for a sexual offense (§ 288.3, subd. (a), counts 9 through 12); and lewd acts on a 15-year-old (§ 288, subd. (c)(1), counts 13 through 21). She pled guilty to all counts.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

2

A sentencing hearing was held in November 2019. As relevant here, M.W.'s father appeared and stated M.W. was "physically, emotionally, and intellectually victimized by [Lytle]" and the "trauma experienced by him terrifies him to have to relive this episode and come in here and speak." He described M.W. as an "an athlete, a good student, and very outgoing" who "became sullen, lost interest in activities, and wanted to be alone." Moreover, M.W. was in therapy and had conversations with his brother that caused his brother concern.

With regard to E.G., victim impact statements were offered by his father and grandfather, and a victim advocate read a statement by E.G.'s mother into the record. E.G.'s father stated that E.G. was bullied by his peers and that he lost friends and withdrew from social life at school. E.G.'s father and mother indicated that E.G. blamed himself for the pain caused to Lytle's children, and E.G.'s mother indicated generally that E.G. saw counselors numerous times and was in ongoing therapy. According to E.G.'s father, E.G. had suicidal thoughts at one point but was doing "all right" now and had verbally committed to a college to play a particular sport. E.G.'s grandfather indicated he believed E.G. would need continued counseling but focused his remarks on how Lytle's action had a negative impact on the entire family.

Ultimately, the trial court sentenced Lytle to an indicated sentence of four years and ordered that she register as a sex offender. The court imposed various fines and fees but kept the matter of victim restitution open and set a date for a restitution hearing.

The prosecution filed motions seeking $250,000 in noneconomic restitution for each victim pursuant to section 1202.4, subdivision (f)(3)(F) (section 1202.4(f)(3)(F)), for the victims' past and future psychological harm.

In its initial motion filed in late March 2019, the prosecution referenced materially identical written versions of the victim impact statements from the victims' family members which had been placed in the record after Lytle entered her initial plea earlier that month.[2] Though its motion did not identify the point in time when E.G. and M.W. spoke of their psychological harm,[3] the prosecution argued that the extent of such harm warranted the $250,000 award and that, pursuant to *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*), $250,000 for each victim would be appropriate as an amount that did not shock the conscience or suggest prejudice or corruption.

Prior to sentencing, the probation department had filed a sentencing report that said nothing about any mental health issues suffered by victim M.W. as a result of Lytle's crimes, evidently because the department was unable to reach M.W.'s father. The report, however, contained a short paragraph echoing the victim impact statements of E.G.'s family members about the impact of the crimes on him.[4] After indicating that the prosecution had provided a copy of its motion for restitution, the probation report

---

[2]     These particular impact statements are separate and apart from the victim impact statements that family members offered at the sentencing hearing in November 2019.

[3]     In its motion, the prosecution asserted its understanding that "bullying has affected E.G. so greatly that his family was forced to move homes." But this statement is unsupported by the victim impact statements. Neither E.G.'s parents, nor his grandparents nor pastor, indicated the family had moved. E.G.'s pastor—who testified in June 2020 and had spoken to E.G. five to six weeks previously—asserted that E.G. "*wished* his family would move." (Italics added.)

[4]     Like the prosecution's motion for restitution (see fn. 3, *ante*), the probation report represented that E.G.'s family had moved. But again, such representation was at odds with the statement of E.G.'s pastor and not otherwise borne out by the victim impact statements at sentencing.

summarily concluded: "Therefore, as victims M.W. and E.G. have claimed $250,000 each, in noneconomic losses via psychological harm, provided in the [prosecution's] Motion, Probation recommends restitution in the amount of $250,000 be paid each victim, M.W. and E.G."

Then, on January 16, 2020, the prosecution filed a supplemental motion for restitution. Citing the probation report and the victim impact statements from the victims' parents, the prosecution asked the court to make a prima facie ruling regarding restitution as stated in the probation report and the burden should now be on the defendant to refute the amounts."

Lytle opposed the motion for victim restitution, arguing the prosecution presented no evidence to support the claimed losses.

At a restitution hearing on January 30, 2020, the court indicated it needed more information and wanted to hear from a mental health professional. In the court's words, "it's very hard for me to come up with a monetary amount when I don't know the extent of what's going on other than representation from family members" and "I need something a little bit more along the line of professional levels" in order to quantify the appropriate amount of restitution. Specifically, the court said it wanted to hear "a counselor's assessment of progress and prognosis" and "what affect the counselor has observed." The court scheduled a future contested restitution hearing.

At the hearing in June 2020, the prosecution indicated it would come back at a later date after gathering the additional materials the court had requested, but in the meantime E.G.'s pastor was present to testify. E.G.'s pastor, who had spoken with and counseled E.G. about seven times after the crimes were reported, gave the following testimony. E.G. was easy-going

5

before the crimes but in "emotional shock" after the abuse and full of sadness and guilt because of what would happen to Lytle's children. E.G., at least initially, had no concept about how this would impact his future. E.G. told the pastor he was being taunted and threatened at school, and E.G. wanted to quit sports or change schools, or wished his family could move. Although E.G. presented as suicidal at the midpoint of his meetings with the pastor, he moved on from that and instead started using alcohol and marijuana more regularly. E.G.'s pastor indicated that E.G. had "gotten through the trauma" and "feels better" but has a long road ahead. The prosecution presented no evidence concerning M.W. at this hearing.

At the last restitution hearing in February 2021, the prosecution indicated that it had obtained an expert pursuant to the court's earlier request for additional information, but that due to Covid and numerous continuations, it no longer had the expert. Nevertheless, the prosecution contended there was ample information to make a finding for noneconomic restitution based on the victim impact statements at the sentencing hearing. The prosecution again asked for $250,000 in restitution for each victim to compensate for the pain the victims suffered and will continue to suffer. Lytle objected, arguing that the prosecution's numbers were "tethered to nothing" and also that the bullying that the victims endured could not be ascribed to her. Ultimately, the court made its ruling, stating: "I have spent nine years as the presiding judge of juvenile court and I'm very well aware of the far reaching consequences of child trauma and how it effects [*sic*] the futures from trafficking cases and things like that. [¶] Based on that, I am

awarding $100,000 to each of the victims in restitution." This appeal followed.[5]

## DISCUSSION

Lytle makes three main contentions concerning the trial court's restitution order: (1) the order violated her Sixth Amendment right to a jury trial; (2) section 1202.4(f)(3)(F)—which provides for restitution for noneconomic losses when defendants are convicted of certain sex offenses—violates the federal and state equal protection clauses; and (3) the court abused its discretion by not stating the method it used to calculate the restitution amount or the factual basis for the amount. We will address these contentions in turn, but first briefly set out some general principles concerning restitution.

Article I, section 28, subdivision (b)(13), of the California Constitution establishes that victims have a right "to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer" and that restitution shall be ordered from every convicted wrongdoer when a victim suffers a loss. Section 1202.4 implements this constitutional provision. (*Smith*, *supra*, 198 Cal.App.4th at p. 431.) Subdivision (a)(1) of section 1202.4 declares: "It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." Section 1202.4, subdivision (a)(3), provides that courts must order victim restitution "in accordance with subdivision (f)."

---

[5] The California Supreme Court transferred this matter from the Court of Appeal for the Fifth Appellate District to the First Appellate District on August 9, 2022.

7

In turn, subdivision (f) of section 1202.4 states: "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." Subdivision (f)(3) of section 1202.4 requires, to the extent possible, that the restitution order constitute "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." The statute then goes on to provide a nonexhaustive list of the types of losses to be included in that amount. "With one exception, restitution orders are limited to the victim's economic damages." (*Smith*, *supra*, 198 Cal.App.4th at p. 431.) That exception, which is relevant here, is in section 1202.4(f)(3)(F), which allows restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7."

## A. Jury Trial Right

Lytle first contends the trial court's order for noneconomic restitution violates the Sixth Amendment. Citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny—principally *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*) and *Southern Union Co. v. United States* (2012) 567 U.S. 343 (*Southern Union*)—Lytle contends that a section 1202.4(f)(3)(F) order for noneconomic restitution is punishment beyond the statutory maximum for the alleged offenses that must be submitted to a jury and determined beyond a reasonable doubt.

Initially, the People contend that Lytle forfeited the claim as she never raised it below. Lytle does not counter this. Indeed, the record reflects that Lytle pled guilty to all of the charges in this case after defense counsel

discussed with her all of her rights and "all the ramifications" of the case. Though the court held several hearings to consider the issue of noneconomic losses, Lytle never raised this claim regarding jury trial rights. In any event, even if we addressed the merits, we would reject it.

This issue presents a question of law that we review de novo. (*People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1084.)

In *Apprendi*, the United States Supreme Court held that, apart from the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra*, 530 U.S. at p. 490.) In *Blakely*, the court clarified that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Blakely, supra*, 542 U.S. at p. 303, italics omitted.) And in *Southern Union*, the high court held the Sixth Amendment right to a jury applies to "sentences of criminal fines." (*Southern Union, supra*, 567 U.S. at p. 346.)

Lytle acknowledges the numerous cases holding that "neither *Apprendi* nor *Southern Union* applies to direct victim restitution because direct victim restitution is not a criminal penalty." (E.g., *People v. Foalima* (2015) 239 Cal.App.4th 1376, 1398; *People v. Wasbotten* (2014) 225 Cal.App.4th 306, 309; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1183–1184.) But Lytle argues these cases are distinguishable because they concerned economic losses, not noneconomic losses. We are not convinced.

In *Smith, supra*, 198 Cal.App.4th 415, the appellate court concluded that a restitution order for noneconomic damages is a sentencing order that "does not give rise to a jury trial right." (*Smith*, at p. 433.) In so concluding, the *Smith* court rejected the defendant's contentions that (1) unlike economic

9

damages, noneconomic damages are determined pursuant to a subjective standard and that such determinations must be made by a jury; and (2) because noneconomic restitution is indistinguishable from noneconomic damages in the civil trial context, " 'there is no rational reason why they should not be subject to the right to a jury trial.' " (*Ibid*.) As to the first contention, the *Smith* court observed "there is no basis for distinguishing jury trial rights, or lack thereof, for restitution orders for economic damages and restitution orders for noneconomic damages. In both cases, the trial court is performing a task that, in a civil case, a jury would perform." (*Ibid*.) As for the second contention, the *Smith* court relied on precedent holding that a restitution hearing need not " 'approximate the formality of a civil trial' " and that " 'the preponderance of the evidence standard satisfies due process.' " (*Ibid*.) We see no reason to reject *Smith*'s reasoning.

Lytle further suggests that restitution for noneconomic losses warrants a jury trial because it applies only to defendants convicted of certain sex crimes (i.e., §§ 288, 288.5, and 288.7) and is therefore punitive on its face. Citing *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144 (*Kennedy*), she asserts there is no reason other than punishment for subjecting this particular group of defendants to noneconomic restitution in their criminal proceedings, where they are afforded fewer constitutional protections. This contention misses the mark.

The United States Supreme Court has identified the following factors as useful guideposts for determining whether a particular statutory scheme is so punitive either in purpose or in effect so as to transform what was intended as a civil remedy into a criminal penalty: "(1) 'whether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a

10

finding of scienter'; (4) 'whether its operation will promote the traditional aims of punishment—retribution and deterrence'; (5) 'whether the behavior to which it applies is already a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.' " (*Hudson v. United States* (1997) 522 U.S. 93, 99–100, citing *Kennedy*, *supra*, 372 U.S. 169.)

Though Lytle conclusorily asserts there is no reason other than punishment for subjecting defendants convicted of violating sections 288, 288.5 or 288.7 to noneconomic restitution, there is an obvious and perfectly rational alternative purpose for such restitution, namely, to provide compensation to child victims who have endured sexual abuse, which generally has serious and long-term psychological effects. (See, e.g., Sen. Com. on Public Safety, Analysis of Sen. Bill No. 756 (2017–2018 Reg. Sess.) Feb. 17, 2017, p. 2 .) Further, Lytle does not address the other *Kennedy* factors weighing strongly in favor of a conclusion that noneconomic restitution is compensatory rather than punitive. For example, section 1202.4(f)(3)(F) does not require scienter, and historically restitution orders have not been regarded as punishment. (*People v. Harvest* (2000) 84 Cal.App.4th 641, 650.) And contrary to Lytle's suggestion, an order for noneconomic restitution does not involve the imposition of an "affirmative disability or restraint" and "certainly nothing approaching the 'infamous punishment' of imprisonment." (*Flemming v. Nestor* (1960) 363 U.S. 603, 617; *Harvest, supra,* 84 Cal.App.4th at p. 650 [victim restitution "does not involve an affirmative disability or restraint"].)

Next, Lytle contends noneconomic restitution is punitive in effect because "it is not limited to compensation for a specific sum, the victim's

11

demonstrated and actual losses," but instead is subjective, unlimited, and can "involve 'substantial' sums." Lytle asserts that "[s]ubjective decisions regarding intangible damages under the common law, and until the enactment of section 1204.2, subdivision (f)(3)(F), were allocated to the jury because the jury has been deemed to be in the position to make those decisions." This contention is lacking in merit.

As Lytle acknowledges, economic restitution, like noneconomic restitution, "can involve substantial sums as well." (*People v. Giordano* (2007) 42 Cal.4th 644, 661 [several enumerated categories of loss may "result in large restitution awards"].) But in cases involving either type of restitution, the trial court's broad discretion in making an order is not unlimited. While an order need not be restricted to the exact amount of loss, the court "must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992.)

In sum, we reject Lytle's Sixth Amendment contention that noneconomic restitution is punishment that necessitates a jury trial.

## B. Equal Protection

Lytle next contends that section 1202.4(f)(3)(F) violates the federal and state equal protection clauses by singling out defendants convicted of certain sex offenses against children—violations of section 288, 288.5, or 288.7[6]—but not those convicted of other crimes or other sex crimes against children. In

---

[6] Section 288 criminalizes lewd conduct with a child under the age of 14 years old, and in some cases with victims who are 14 or 15 years old. (§ 288, subds. (a), (c)(1).) Section 288.5 criminalizes continuous sexual abuse of a child under the age of 14 years, and section 288.7 criminalizes various sexual acts (intercourse, sodomy, oral copulation, and sexual penetration) with a child under 10 years of age.

her view, the statute "irrationally discriminates solely on the basis of the sexual act, or even more irrationally, on the basis of the statute under which the sexual act is punished."

The People first argue that appellant has forfeited this claim by failing to object below, and Lytle does not counter the point. Nevertheless, even if we considered the merits, we would reject the claim.

In *Smith*, the defendant similarly contended that his state and federal equal protection rights were violated by an order for noneconomic restitution under former section 1202.4(f)(3)(F), which was then applicable only to " '[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288' " (without enumerating sections 288.5 and 288.7). (*Smith, supra,* 198 Cal.App.4th at p. 431.) In rejecting this claim, the *Smith* court first concluded that "child molesters are not similarly situated to other criminals." (*Ibid.*) Then applying the rational basis test, the court determined that the differential treatment is rationally related to a legitimate public purpose, i.e., to protect child sexual abuse victims. (*Id.* at p. 435.) Though the defendant had suggested strict scrutiny should apply because the statute impacted his constitutional right to a jury trial, the court observed: "Violators of section 288 have the same civil jury trial rights as anyone else. But this is not a civil jury trial; it is a criminal sentencing. Therefore, strict scrutiny is inapplicable." (*Ibid.*)

Lytle fails to set forth any argument supporting a departure from *Smith*'s application of the rational basis test as the appropriate equal protection standard. Nor does she offer any legal or logical basis for distinguishing *Smith* or reaching a different conclusion here.

The rational basis test applies when the challenged statutory disparity implicates no suspect class nor infringes on a fundamental right. (*Johnson v.*

*Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).) Under the rational basis test, the statutory disparity will withstand an equal protection challenge as long as the disparate treatment is rationally related to a legitimate governmental purpose. (*Ibid.*) "To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity." (*Ibid.*)

In her briefing, Lytle makes generalized arguments that treating offenders convicted of violating section 288, 288.5, and 288.7 differently than other offenders—i.e., by allowing an award of noneconomic losses without the rigorous scrutiny and consensus of a jury—has no rational basis. While it is true that section 1202.4(f)(3)(F) limits its application to certain child sex offenders, this does not mean the disparate treatment is not rationally related to a legitimate governmental purpose—here, that these child sexual abuse victims are deserving of restitution to compensate for their noneconomic losses, including harm to their psyche.

Indeed, section 1202.4(f)(3)(F) was specifically intended to "help address the mental health needs of children who are victims of serious sex crimes," in light of legislative recognition that "[t]he trauma that young children experience from egregious sex crimes takes an enormous psychological toll, leaving them anxious, depressed, withdrawn and even suicidal. To cope, many need the help of a mental health counselor to help understand that they can recover from the abuse, trust adults and lead a normal life." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 756 (2017–2018 Reg. Sess.) Feb. 17, 2017, p. 2; see Assem. Com. on Appropriations, Analysis of Sen. Bill No. 756 (2017–2018 Reg. Sess.) p. 1 [" 'SB 756 will help address the mental health needs of children who are victims of serious sex crimes' "].) In this regard, the statute need not apply to

14

all sex crimes against children in order to comply with equal protection principles. That is because rational basis review requires that we " 'accept any gross generalizations and rough accommodations that the Legislature seems to have made.' [Citation.] 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citations], or 'because it may be "to some extent both underinclusive and overinclusive." ' ' " (*Johnson*, *supra*, 60 Cal.4th at p. 887.)

In sum, we reject Lytle's equal protection challenge to section 1202.4(f)(3)(F).

### C. Abuse of Discretion

Relying on *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1179–1180 (*Valenti*), Lytle contends the court abused its discretion in ordering $200,000 in noneconomic restitution for the victims ($100,000 each) because the court did not state its method of calculation or the factual basis for its order. She raises a valid point.

In *Valenti*, the trial court awarded noneconomic restitution in the amount of $50,000 per year—for a total of $450,000—to each of eight victims of the defendant's sexual abuse. (See *Valenti*, *supra*, 243 Cal.App.4th at pp. 1180–1181.) In concluding the record offered no rational basis for the trial court's calculation of noneconomic loss at $50,000 for three of the victims, the *Valenti* court explained: "The trial court has broad discretion to choose a method for calculating the amount of restitution, but it must employ a procedure that is rationally designed to determine the victim's losses. [Citation.] The court 'must demonstrate a rational basis for its award, *and ensure that the record is sufficient to permit meaningful review*. The burden is on the party seeking restitution to provide an adequate factual basis for the claim.' " (*Id*. at p. 1182, italics added.)

15

We concur in this portion of *Valenti*'s analysis. When a court does not indicate the basis for the restitution order, it is difficult to see how such an order could be meaningfully reviewed for passion, prejudice, corruption, or some other abuse of discretion (aside perhaps from an amount that is patently excessive). As explained in other contexts, "a requirement of articulated reasons to support a given decision serves a number of interests. In the first place, . . . the statement of such reasons will frequently be essential to any meaningful review of the decision. Secondly, a requirement of articulated reasons acts as an inherent guard against the careless decision, insuring that the [court itself] analyzes the problem and recognizes the grounds for [its] decision. Finally, articulated reasons aid in preserving public confidence in the decision-making process 'by helping to persuade the parties [and the public] that . . . decision-making is careful, reasoned and equitable.' " (*In re Podesto* (1976) 15 Cal.3d 921, 937 [prospectively requiring courts to provide a statement of reasons for denying a defendant's motion for bail on appeal].)

In adopting the foregoing standard in *Valenti*, we acknowledge that the explanation for a calculation of noneconomic restitution need not, or perhaps cannot, be as detailed as when calculating economic losses, and that subjectivity will play a role. But providing a sufficiently adequate explanation is not only possible but will serve the public interests in promoting public confidence and guarding against careless decision-making. For example, in *People v. Lehman* (2016) 247 Cal.App.4th 795 (*Lehman*), the appellate court rejected the defendant's challenges to the trial court's noneconomic restitution awards because the court specifically identified the bases for its awards to the two victims, Jane Does 1 and 2, who were the defendant's granddaughters. (*Id.* at pp. 802–803.) In particular, the trial

16

court cited Jane Doe 1's testimony at trial and her statements at sentencing—in which she described the emotional pain she suffered from the long-term and extensive abuse by her grandfather—to support its conclusion that the defendant's molestation of Jane Doe 1 caused her "immeasurable psychological harm." (*Ibid.*) Similarly, the trial court pointed to Jane Doe 2's visibly distraught testimony and her "emotional breakdown" on the stand as " 'manifestations of the psychological harm the [d]efendant caused Jane Doe [2] to suffer because of his conduct against her, his conduct against her sister, and the resulting devastation to the family.' " (*Id.* at pp. 803, 805.) Based on the evidence and its observations of the victims, the *Lehman* court found that the noneconomic restitution awards were amply supported and that the amounts did not shock the conscience. (*Id.* at pp. 803–805.)

Unlike in *Lehman*, the trial court here did not identify any specific evidentiary basis for its awards or otherwise explain how it arrived at the $100,000 figure for each victim. Rather, after hearing from the victims' family members, the court indicated, at least initially, that it needed information from mental health professionals to calculate the appropriate amount of restitution. Then, upon learning at the February 2021 restitution hearing that the prosecution's mental health expert would not be available, the court issued its order of $100,000 to each victim. But in contrast to what happened in *Lehman*, where the trial court actually made findings based on the evidence, the trial court here merely stated its award was based on its own juvenile court experience and its awareness—apparently from "trafficking cases"—of the consequences of child trauma and its future effect. But this was not a trafficking case, and the record here does not supply an

17

obvious basis for the magnitude of restitution ordered for each victim.[7]  Thus, we cannot simply excuse the trial court's failure to mention any facts, cite any reliable evidence, or otherwise explain how it calculated the respective amounts of restitution.

On this latter point, we note the prosecution's motion for noneconomic restitution did not explain with any specificity how it arrived at the requested amount of $250,000 per victim, but instead argued the victims had suffered psychological harm and asserted the requested amount did not shock the conscience.  On appeal, the People rely on *Smith*, *supra*, 198 Cal.App.4th 415, for the proposition that a restitution order for noneconomic losses must be affirmed if the order " 'does not, at first blush, shock the conscience, or suggest passion, prejudice, or corruption.' "  To the extent the People suggest this standard applies to the exclusion of the standard in *Valenti*, we disagree.

In *Smith*, a jury had convicted the defendant of molesting the victim from the time she was eight years old until she turned 15.  (*Smith*, *supra*, 198 Cal.App.4th at p. 419.)  Moreover, the opinion recited that the evidence at the restitution hearing established that the victim "was still having nightmares and flashbacks concerning the abuse"; that "she had been in therapy to deal with the problems caused by the abuse"; and that she "was having difficulty keeping jobs, and, at age 30 at the time of the hearing, had not finished her

---

[7]     Because the case was settled by plea, the trial court never heard from the victims directly and had no opportunity to observe their demeanor.  (Cf. *Lehman*, *supra*, 247 Cal.App.4th at pp. 803–804.)  And with regard to M.W. in particular, who received the same $100,000 award as E.G., the only evidence presented about the harm he suffered consisted of his father's statement at sentencing in 2019. While that statement indicated that M.W. was experiencing some psychological harm in 2019, there was no evidence regarding M.W.'s psychological state at the time of, or leading up to, the restitution hearing in February 2021.

[college] education"; and that she "twice attempted suicide by overdosing on ibuprofen." (*Id*. at p. 432.) Though the source of all that evidence is unclear from the opinion, it is apparent that the *Smith* court was not purporting to address the procedural type of challenge made here. Contrary to the People's assumption, it is premature at this point to focus on whether or not the restitution amount is excessive. Rather, we must contend with the trial court's failure to indicate what methodology or facts were used to calculate the noneconomic restitution amounts at issue.

In this case, we cannot perform meaningful judicial review of this restitution order as we are left to speculate why the court determined that a $100,000 amount was appropriate for each victim. (Cf. *In re Pipinos* (1982) 33 Cal.3d 189, 202.) Thus, we will reverse the noneconomic restitution order and remand for further restitution proceedings. (*Valenti, supra*, 243 Cal.App.4th at p. 1184.) We express no opinion as to the proper amount of noneconomic restitution to be imposed in this case.

## DISPOSITION

The order for noneconomic restitution (§ 1202.4(f)(3)(F)) is reversed, and the matter is remanded for further restitution proceedings. The trial court may, if it deems it appropriate, receive additional evidence and reconsider the noneconomic restitution amount. When issuing a future order concerning noneconomic restitution, the court must ensure that the record is sufficient to permit meaningful review. (*Valenti, supra*, 243 Cal.App.4th at p. 1182.) In all other respects, the judgment is affirmed.

FUJISAKI, J.

WE CONCUR:

TUCHER, P.J.

RODRÍGUEZ, J.

*People v. Lytle* (A165859)

20