Filed 4/21/23  P. v. Edelen CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD ALFONSO EDELEN,<br><br>    Defendant and Appellant. | D080277<br><br><br>(Super. Ct. No. SCD289841) |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Michelle J. Cameron-Hunsaker for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Edward Alfonso Edelen pled guilty to assault with force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4)), and the trial court placed him on formal probation. Among other terms and conditions, the court required Edelen to pay restitution to the victim, who happened to be a lawyer. The amounts awarded in restitution included substantial sums for the victim's lost wages and for legal fees the victim incurred in civil proceedings filed against Edelen. Edelen argues the court abused its discretion by awarding restitution of these claimed losses. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Conduct Underlying the Criminal Charges Filed Against Edelen*

A.     *Counts 1 and 2*[2]

On March 26, 2021, 26-year-old Edelen was arrested for assaulting C.B., his landlord. Edelen recently had moved into an apartment complex owned by C.B. and C.B.'s wife, and he had been the subject of several complaints of loud noise and being aggressive toward neighbors.

C.B. and his wife drove to the complex and placed a three-day notice on Edelen's door. The notice stated Edelen needed to "address the complaints and fix the problems" or they would file for eviction. Edelen followed C.B. and his wife as they walked back to their car and yelled at them. C.B. and his wife got in their car, and as they pulled away, Edelen tore up the notice.

---

[1]     Further unspecified statutory references are to the Penal Code.

[2]     Edelen was convicted by his guilty plea, and there was no preliminary hearing. Our factual summary is derived from the stipulated factual basis for his guilty plea and the probation report, which in turn relied on reports of the San Diego Police Department.

C.B. told his wife to stop the car so he could take a picture of the notice for evidence. When C.B. got out of the car, Edelen ran at him and pushed him.

C.B.'s wife heard the sound of a head hitting the asphalt. She looked up and saw C.B. lying on the asphalt unconscious with Edelen standing over him. Edelen punched the unconscious C.B. four times in the face. Edelen ran off, and she ran to C.B., who was bleeding from his nose and mouth and had blood on his ear.

Police officers responding to the scene found C.B.'s wife helping C.B. sit up in the middle of the street. C.B. had bruises on his face, a swollen, bloody lip, and a cut on his scalp. There was a line of blood from his left ear to his mouth. He had difficulty speaking and did not know what had happened to him.

B.  *Counts 3 and 4*

As the officers were leaving, J.W. and B.L. reported that Edelen had burst into their apartment, jumped on top of J.W., and started punching him. J.W. said he had been struck on his legs, torso, and head, but was not injured. B.L. reported that Edelen had tried to punch him but did not connect. Edelen's girlfriend came in, pulled him off, and took him out of the men's apartment.

Edelen initially fled the scene, but he returned while the police were still investigating. Edelen stated that he had been in an ongoing dispute with his neighbors, J.W. and B.L., about noise levels. When C.B., whom Edelen had never met, showed up at his apartment and served him with paperwork, Edelen was confused and thought it stemmed from J.W. and B.L. complaining about him. Edelen followed C.B. and his wife to their car to tell them to leave him alone. When they started to leave, he got scared and tore up the notice because he thought they were going to hit him with their car.

3

When C.B. exited the car to take pictures of the notice, C.B. approached Edelen's girlfriend and tried to hand paperwork to her. At this, Edelen " 'snapped' " and punched C.B. twice in the face. C.B. fell and was not moving. As Edelen was returning to his apartment, he stopped at J.W. and B.L.'s apartment and began punching them because he was still upset. Edelen then realized what he was doing and left.

## II.

### *Procedural Background*

#### A.    *Charges, Conviction, and Sentence*

Edelen posted bail the morning after his arrest and was given an arraignment date in August 2021. A felony complaint was filed charging Edelen with assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 1), with an infliction of great bodily injury enhancement allegation (§ 12022.7, subd. (a)); battery resulting in infliction of serious bodily injury (§ 243, subd. (d); count 2); and two counts of simple battery (§ 242; counts 3 and 4). At the scheduled arraignment, Edelen entered a not guilty plea, and a criminal protective order was issued naming C.B. as the only protected person.

In September 2021, pursuant to a negotiated plea agreement, Edelen pled guilty to the assault charge in count 1. In exchange, the prosecution agreed to dismiss the enhancement allegation and remaining counts. The plea agreement included a *Harvey*[3] waiver and Edelen stipulated that he would pay full restitution. At the sentencing hearing, the trial court suspended imposition of sentence and placed Edelen on two years of formal probation.

---

3    *People v. Harvey* (1979) 25 Cal.3d 754.

B.    *Restitution Hearing*

A formal restitution hearing was held in February 2022.  Prior to the hearing, the prosecution filed a brief seeking victim restitution totaling $184,014 on behalf of C.B., in addition to a total of $7,039.79 on behalf of the California Restitution Board.  The prosecution stated that C.B. was an attorney at a "premier legal firm."  His hourly rate as a partner was $750, and he billed an average of 100 hours per month.  He was requesting lost wages for April and May 2021 to make up for billable hours he lost due to the lingering effects of his injuries.  He also sought lost wages of $6,750 for nine hours spent attending court in the criminal case as well as a civil proceeding in which he sought a restraining order against Edelen, and $15,000 for 20 hours of physical therapy appointments he attended between July and October 2021.

The prosecution attached several exhibits to its brief, including a sample client engagement letter from C.B.'s law firm showing C.B.'s hourly rate as of December 2020 was $750, and a report of C.B.'s billable hours for January through August 2021.  C.B.'s billable hours showed that from January through August 2021, his monthly billable hours had ranged from a low of 103.05 to a high of 136.15 in the months other than April and May.  In April, he recorded 2.5 billable hours, and in May, he recorded 22.55 billable hours.  The prosecution calculated that C.B. was entitled to receive restitution in the amount of $67,076 for his wage losses in April 2021 and $56,700 for his wage losses in May 2021.[4]  Thus, C.B.'s total wage loss claim,

---

[4]    The prosecution calculated these amounts as follows.  For April 2021, C.B. lost 97.5 billable hours (average of 100 billable hours per month minus 2.5 actually billed), multiplied by $750 per hour equals $73,125, offset by $6,048.43 received from collateral sources, for a total loss of $67,076.57.  For May 2021, C.B. lost 75.6 billable hours (average of 100 billable hours per

including these amounts as well as amounts he sought for time spent attending court hearings and physical therapy appointments, was $145,526. In addition to this sum, C.B. also requested reimbursement of a $10,000 retainer paid to an outside law firm[5] to obtain a civil restraining order against Edelen, $8,500 in "[e]viction legal fees," and other amounts not relevant to this appeal.

The defense filed an opposition brief in which it argued C.B.'s lost billable hours were not recoverable as restitution because they were not lost wages, they were "what the attorney bills to the client[.]" The defense asserted that it believed C.B. received a salary, and suggested his salary payments were unaffected in April and May 2021 such that C.B. did not actually lose income as a result of the incident. The defense also argued there was no need to initiate eviction proceedings against Edelen because Edelen's attorney had sent C.B.'s outside counsel a letter on April 9, 2021 stating Edelen was willing to voluntarily leave his apartment by April 30.

At the restitution hearing, C.B. testified he is a lawyer as well as the principal and sole shareholder of a small law firm. As the result of the assault, he suffered a concussion so severe it caused him to suffer vertigo that kept him bedridden for 30 days. He could not stand, walk, see clearly, or read. He received neurological treatment that allowed him to slowly regain the ability to sit up and interact. He was finally able to walk without fear of falling 60 days after the assault.

---

month minus 24.4 actually billed), multiplied by $750, equals a total loss of $56,700.

[5] The prosecution's exhibits included a July 2021 email reflecting the outside law firm's receipt of a $10,000 payment from C.B.

Due to his injuries, C.B. was unable to perform his usual work as a litigator for much of April and May 2021. C.B. verified that his billable hours reports reflected his inability to work and bill his usual number of hours during this period. His hourly rate at that time was $750; his clients had been paying this rate since December 2020. C.B. testified he could not recall the last time he billed and collected less than 100 hours in a month.

C.B. testified his actual income was affected by the number of hours he billed. His law firm was organized as an S corporation, so "whatever the profits are at the end of year, they go down to [him.]" He periodically took distributions, which included amounts he billed and collected. He stated the reduction in his billable hours in April and May 2021 reflected a "[d]ollar for dollar," actual loss of income for him. He was not able to make up for the loss by billing additional time in other months. C.B. also confirmed his attendance of the court hearings and physical therapy appointments underlying his additional requests for reimbursement of wage loss.

C.B. paid the $10,000 retainer to an outside law firm to seek a civil restraining order against Edelen. C.B. decided he needed to get a restraining order protecting the complex as well as himself because Edelen posted bail quickly and returned to the complex. The day after the assault, C.B. and his wife received a call from a tenant complaining that there had been another altercation (apparently involving Edelen). Other tenants reported concerns about Edelen "being a hot head at the apartment complex." He decided to proceed civilly rather than wait for entry of a criminal protective order after learning it would not be possible to see a criminal judge any sooner than Edelen's arraignment, which was not scheduled to take place until August 2021.

A temporary restraining order was granted four or five days after the assault, although there was an error on it that "required more work." By the time of the restitution hearing, a permanent restraining order had been entered against Edelen and was still in effect.

The $8,500 in "[e]viction legal fees" requested by C.B. represented legal fees and costs he incurred suing to evict Edelen and his girlfriend from their apartment. Before the assaults, tenants had complained that Edelen was hostile and aggressive towards them. The reason C.B. and his wife were at the complex on the day of the incident was to serve Edelen a three-day notice "to get his act together or move out."

After Edelen committed the assaults, tenants were concerned. By the end of the three-day notice period, Edelen had not left voluntarily, and C.B. "needed to get him out." The unlawful detainer suit required extra work because it was filed during the COVID-19 pandemic and evictions were not being granted unless the case involved an exceptional circumstance. Also, although Edelen's lawyer had sent a letter representing that Edelen would agree to move out, Edelen and his girlfriend filed an answer to the unlawful detainer complaint, turning it into a contested case. Edelen finally vacated the apartment sometime in late April or May of 2021. The $8,500 sought was the actual dollar amount C.B. paid a contract attorney, process servers, and other vendors to handle the case.

Defense counsel cross-examined C.B. but did not otherwise present evidence. On cross-examination, C.B. acknowledged receiving a base salary of $100,000 per year, or $8,333.33 per month, in addition to taking distributions from his firm. He testified that he suffered $130,000 in lost profits in 2021, which he attributed in large part to the hours he did not work in April and May 2021. Although others may have covered his court

8

appearances during this time, a hearing might have been delayed but that did not mean he did not lose billable work. C.B. did not have just a fixed amount of work that could be done by others. He had "a ton of work," roughly 80 pending cases. C.B. testified that when he was "laid up for a month or six weeks, whatever it is, that's just billable work that will not get done."

Defense counsel did not cross-examine C.B. about the $10,000 retainer, the $8,500 eviction fees and costs, or the court hearings and physical therapy appointments he claimed caused him to lose additional billable hours.

At the conclusion of the hearing, the trial court found C.B. had sustained a debilitating injury and spent a month to 60 days recovering from that injury. It further found the prosecution had proved by a preponderance of the evidence that C.B. had, in fact, suffered wage losses of $67,076 in April 2021 and $56,700 in May 2021, and $15,000 for attending physical therapy sessions. The court granted restitution totaling $6,780 for C.B.'s attendance of court hearings, which included $6,750 for nine lost billable hours at $750 per hour. The court explained to Edelen, "you take the plaintiff as you find him," and "in this particular case, the plaintiff happens to be a lawyer that has wages that add up to that amount."

The court stated it "struggl[ed] a bit" with the request for $8,500 in eviction legal fees, but granted them on the ground the eviction process was "intertwined with the criminal case because it's part and parcel of what occurred in this case." It also granted restitution of the $10,000 law firm retainer, stating "but for this incident, there would have been no need for [C.B.] to have sought a temporary restraining order and sought outside legal counsel to keep himself and the other tenants safe."

The trial court also granted restitution of the other sums sought by the prosecution, with the exception of one request not at issue here. In all, the

court ordered Edelen to pay restitution of $181,014 to C.B., and $7,039.79 to the California Victim Compensation Board. In response to defense counsel's assertion that Edelen was currently earning less than $2,000 per month, the court set Edelen's restitution payment obligations at $50 per month starting in June 2022.

## DISCUSSION

Edelen challenges the trial court's decision to award C.B. $145,556 in lost wages for the billable hours he lost while recovering from his injuries, attending court hearings and physical therapy sessions, as well as the $10,000 law firm retainer and $8,500 legal fees and costs. He argues the court abused the authority conferred by section 1202.4 by granting restitution of these amounts, and asks us to strike them from the restitution order. The People respond that Edelen has based his appellate challenge on the wrong statute. They contend this case is governed by section 1203.1, which applies to probation cases and grants courts broader discretion to award victim restitution than in non-probation cases, which are governed by section 1202.4. Edelen did not file a reply brief on appeal opposing the People's arguments. As we shall discuss, Edelen fails to establish an abuse of discretion.

## I.

### *Relevant Legal Principles*

Article 1, section 28, subdivision (b), of the California Constitution sets forth a " 'broad constitutional mandate . . . that restitution must be imposed "in every case . . . in which a crime victim suffers a loss[.]" ' " (*People v. Kelly* (2020) 59 Cal.App.5th 1172, 1178 (*Kelly*).) In keeping with this mandate, " 'statutory provisions implementing the constitutional directive [that victim

10

restitution be made] have been broadly and liberally construed.' " (*People v. Stanley* (2012) 54 Cal.4th 734, 737 (*Stanley*).)

One of these implementing provisions is section 1202.4, which states: "It is the intent of the Legislature that a victim of a crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1); see *People v. Giordano* (2007) 42 Cal.4th 644, 656 (*Giordano*).) Section 1202.4 further requires that "in every [criminal] case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).) It states that any such restitution order shall "fully reimburse the victim . . . for *every* determined economic loss incurred as the result of the defendant's criminal conduct, including, *but not limited to*" 12 listed categories of loss.[6] (§ 1202.4, subd. (f)(3)(A)–(L), italics added; see *Stanley*, *supra*, 54 Cal.4th at p. 737.)

The California Supreme Court has held that because the categories of loss listed in section 1202.4, subdivision (f)(3), are "expressly nonexclusive," the statute does not limit restitution to the listed categories. (*Giordano*, *supra*, 42 Cal.4th at p. 660.) "The only limitation the Legislature placed on victim restitution is that the loss must be an ' " 'economic loss' " ' incurred as a result of the defendant's criminal conduct." (*People v. Williams* (2010) 184 Cal.App.4th 142, 147.) The phrase " 'economic loss,' " in turn, "is accorded an

---

6    A defendant's inability to pay may not be taken into consideration in determining the amount of a restitution order. (§ 1202.4, subd. (g).)

11

expansive interpretation under our laws." (*In re Alexander A.* (2011) 192 Cal.App.4th 847, 854, fn. 4.)

Another provision that implements the constitutional mandate in favor of victim restitution is section 1203.1, which applies to cases in which the court suspends imposition or execution of sentence and grants probation. (See § 1203.1, subd. (a); *People v. Martinez* (2017) 2 Cal.5th 1093, 1101.) Section 1203.1 requires a court to "provide for restitution in proper cases." (§ 1203.1, subd. (a)(3).) Our high court has held that section 1203.1 confers a trial court with even broader discretion to order victim restitution in probation cases than in non-probation cases, which are governed by section 1202.4. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121; accord, *People v. Anderson* (2010) 50 Cal.4th 19, 25–29 (*Anderson*); *Martinez*, at pp. 1101–1102.) Trial courts have authority under section 1203.1 "to impose restitution as a condition of probation in circumstances not otherwise dictated by section 1202.4." (*Anderson*, at p. 29.) Under section 1203.1, the restitution condition need only be "reasonably related either to the crime of which the defendant is convicted or to the goal of deterring future criminality." (*Carbajal*, at p. 1123.)

"The standard of proof at a restitution hearing is preponderance of the evidence. [Citation.] A victim's statement of economic loss is prima facie evidence of loss." (*People v. Grandpierre* (2021) 66 Cal.App.5th 111, 115 (*Grandpierre*).) " ' " '[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider' " ' in determining victim restitution." (*People v. Phu* (2009) 179 Cal.App.4th 280, 283.) The loss may be based on the victim's estimate. (*People v. Goulart* (1990) 224 Cal.App.3d 71, 82–83.) It may also be based on "[d]ocumentary evidence, such as bills, receipts, . . . business records, and similar documents relevant

to . . . wages and profits lost[.]" (§ 1203.1d, subd. (d).) Once a prima facie case of economic loss has been made, "the defendant has the burden to disprove the amount of losses the victim claimed." (*Grandpierre*, at p. 115.)

A victim restitution order is reviewed for abuse of discretion. (*Giordano*, *supra*, 42 Cal.4th at p. 663.) "We determine whether the restitution order, as a condition of probation, is arbitrary or capricious or otherwise exceeds the bounds of reason under the circumstances. [Citations.] 'A condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality[.]" ' " (*Anderson*, *supra*, 50 Cal.4th at p. 32, quoting *People v. Lent* (1975) 15 Cal.3d 481, 486.) " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " (*People v. Mearns* (2002) 97 Cal.App.4th 493, 499 (*Mearns*).)

## II.

### *The Trial Court Did Not Abuse Its Discretion*
### *by Granting Restitution of C.B.'s Claimed Lost Wages*

Edelen advances three reasons why the trial court abused its discretion by granting restitution of C.B.'s claimed lost wages. First, he argues C.B.'s lost billable hours constituted an economic loss to C.B.'s law firm, which was not the victim of the crime, rather than to C.B. Second, Edelen argues an attorney's billable hours are "an amount collected by a lawyer . . . and are not classified as wages, profits, or commission," one of the categories of loss listed in section 1202.4, subdivision (f)(3). Third, he argues C.B.'s income losses

13

should have been calculated using his base salary rather than his billable hourly rate.

The People respond that Edelen's arguments improperly rely on section 1202.4 rather than section 1203.1. They argue the trial court did not abuse its discretion under section 1203.1 when it awarded C.B.'s lost wages because his wage losses were reasonably related to Edelen's crime and restitution of C.B.'s wage losses served a rehabilitative purpose.

We would find no abuse of discretion under either restitution provision. The procedures for proving and rebutting a victim's claim of loss do not differ based on which restitution statute governs. (See, e.g., *Grandpierre, supra,* 66 Cal.App.5th at pp. 114–116 [describing the burden-shifting procedures that apply in a probation case]; *People v. Lehman* (2016) 247 Cal.App.4th 795, 801 [describing the same burden-procedures as applicable in a non-probation case].) Edelen's challenges to the award of C.B.'s wage losses are more factual than legal. They fail not because he analyzes the restitution award under the wrong statute, but because his arguments rely on factual propositions that were not established by evidence in the trial court.

We start with Edelen's first challenge—that C.B.'s lost billable hours were not recoverable because they represented a loss only to C.B.'s law firm, and not to C.B. himself. The problem with this argument is that it ignores the evidence presented at the restitution hearing. The prosecution established that during the period C.B. was recovering from his injuries, he billed substantially less than his usual 100 hours per month, resulting in a loss to the firm of $750 per hour for each hour he did not bill. C.B.'s supporting documentation as well as his own testimony substantiated his claim that he lost 97.5 billable hours in April 2021 and 75.6 billable hours in

14

May 2021 due to his injuries, as well as nine more hours attending court hearings and another 20 hours going to physical therapy sessions.

Although the retainer agreement produced by C.B. tended to show any client payments would have been directed to C.B.'s law firm rather than to C.B. himself, C.B. testified his law firm was organized as an S corporation,[7] he was its only shareholder, and he took periodic distributions of the firm's profits. He further testified the hours he did not work were not made up by the work of another lawyer, that he was unable to make up for the loss himself by doing extra work in other months, and that the reduction in his billable hours reflected an actual, "[d]ollar for dollar" loss of income to him.

C.B. was entitled to full reimbursement of all economic losses, including wage and profit losses, he personally incurred as a result of Edelen's crime. (§ 1202.4, subd. (f)(3)(D); see *Giordano*, *supra*, 42 Cal.4th at p. 661.) C.B.'s testimony and documents constituted prima facie evidence his own income, and not just his firm's income, was reduced by the billable hours he was unable to work as a result of his injures from the assault.

The burden shifted to Edelen to disprove the amount of losses that C.B. claimed. But he was unsuccessful in his efforts to disprove C.B.'s claim that he suffered personal income loss as a result of the reduction in his billable hours following the assault. Edelen tried to sustain this burden by questioning C.B., but C.B. yielded no ground on cross examination. In response to defense counsel's questions, C.B. acknowledged receiving a base salary of $8,333.33 per month, but said he also received distributions. He

---

[7] In an S corporation, " ' "[e]ach item of corporate income and expense is 'passed through' to the shareholders in exactly the same form as received by the corporation." ' " (*J.P. Morgan Trust Co. of Delaware v. Franchise Tax Bd.* (2022) 79 Cal.App.5th 245, 269.)

testified his firm experienced a loss in profits in 2021, which he attributed in large part to the hours he was unable to bill due to his injuries. He denied that others in his firm made up for the work he did not perform, stating "when I'm laid up for a month or six weeks, whatever it is, that's just billable work that will not get done."

In short, C.B.'s testimony, together with his supporting documentation, established a prima facie claim he suffered personal economic loss equivalent to the value of the billable hours he lost as a result of Edelen's crime. Edelen was unable to disprove this claim, or to provide the court with a viable alternative theory for valuing C.B.'s lost time. Accordingly, the court did not abuse its discretion when it granted C.B.'s claimed wage losses. (See *Mearns*, *supra*, 97 Cal.App.4th at p. 499.)

For similar reasons, we reject Edelen's argument that an attorney's billable hours cannot be equated with wages or profits for purposes of ordering victim restitution. This argument is poorly developed, but it appears to rely on the theories that the hours a lawyer bills do not become income until they are billed to a client and collected, and a lawyer's hourly rate ordinarily includes business overhead such that any amounts collected are not pure profit.[8]

---

[8] Within this argument, Edelen quotes the federal tax code definition of "Wages" (26 U.S.C. § 3401) without providing any context or explanation how this definition has any bearing on the interpretation of our state's restitution laws. He also does not state what he wishes us to draw from the definition. He simply pastes the quote into his brief and moves on. Edelen's perfunctory, unexplained quotation of federal tax law does not constitute a properly developed appellate argument. (See *T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12 [incomplete, undeveloped arguments are forfeited on appeal].)

While these might seem like reasonable points in the abstract, to reduce restitution, they require evidentiary proof. And Edelen's theories lack such proof. On the subject of collections, at the restitution hearing, C.B. testified he could not recall the last time he "billed *and collected* less than . . . 100 hours per month." (Italics added.) This testimony supported the conclusion that the 100-hour baseline used to calculate C.B.'s losses *did* represent amounts collected; Edelen did not elicit evidence to the contrary. The subject of business overhead was not specifically broached at the restitution hearing. However, once C.B. testified on direct examination that his lost billable hours represented a "[d]ollar for dollar" loss of income to him, the burden shifted to Edelen to present evidence undermining this testimony, which he failed to do. Edelen could have, but did not, question C.B. about the extent to which C.B.'s hourly rate included overhead, whether any of C.B.'s unearned fees would have included business expenses, or whether there was any other basis for reducing his wage loss claim. Since the trial court was provided no factual basis for awarding C.B. less than the amount of his claimed losses, it did not abuse its discretion when it failed to do so.

As for Edelen's contention that C.B. suffered no wage loss because "the firm was still doing the work and getting the billable hours," a similar point was raised and rejected in *Grandpierre*. The defendant in *Grandpierre* was placed on probation after stealing the identity of the victim, who owned 30 percent of an engineering company. (*Grandpierre, supra*, 66 Cal.App.5th at p. 113.) At the restitution hearing, the victim testified he spent 12 business hours dealing with issues related to his credit and business phone number, and that " '[t]he time spent would have been billable hours, had [he] been able to focus on [his] business instead of dealing with this.' " (*Id*. at p. 114.) The victim billed his clients $195 per hour. He "ultimately worked these 12

17

hours outside usual work hours." (*Ibid.*)  The trial court granted restitution to the engineering company in the amount of $2,340, representing 12 hours of the victim's time multiplied by his hourly rate of $195.  (*Ibid.*)

On appeal, the defendant claimed the trial court abused its discretion by ordering restitution to the engineering company since the victim testified he made up the 12 billable hours he had lost.  (*Grandpierre*, *supra*, 66 Cal.App.5th at p. 116.)  The Court of Appeal disagreed.  The victim's testimony that he used 12 work hours he could have billed at $195 per hour was enough to show by a preponderance of the evidence the company suffered the $2,340 loss.  The court stated, "The 12 hours were real and are gone." (*Ibid.*)  Although the victim made up the 12 hours at another time, he "could have used those 12 hours to bill other clients and earn money for [the company]."  (*Ibid.*)

The evidence C.B.'s lost billable hours were real and are gone is even stronger in this case than in *Grandpierre*, because unlike the victim in *Grandpierre*, C.B. did not testify he made up for the lost time at some other juncture.  To the contrary, he expressly testified the lost hours were "just billable work that will not get done."  As in *Grandpierre*, Edelen did not present evidence disproving or undermining C.B.'s claim that his time was not made up by himself or replaced by the work of other lawyers at his firm. We reach the same conclusion as in *Grandpierre*:  the trial court did not abuse its discretion when it ordered restitution of the billable hours C.B. lost due to the assault.

Finally, Edelen asserts that C.B.'s income losses in April and May 2021 should have been calculated using his monthly base salary of $8,333.33 rather than his billable hourly rate.  Once again, this argument lacks evidentiary support.  As Edelen implicitly acknowledges, C.B. testified he

18

received two forms of payment from his firm: a base salary, and distributions of the law firm's profits, which included amounts he billed and collected. C.B. claimed a loss of the latter category of income, not the former. The evidence presented at the restitution hearing was prima facie evidence he suffered the loss, and Edelen was unsuccessful in his efforts to disprove the claim. The trial court did not abuse its discretion by ordering restitution to compensate for this claimed loss. (§ 1202.4, subd. (f)(3)(D).)

III.

*Edelen Fails To Establish the Trial Court Abused Its Discretion by Ordering Restitution of the Retainer and Eviction Fees*

Next, Edelen contends the trial court erred by granting C.B. restitution of the $10,000 retainer he paid the outside law firm to obtain the civil restraining order against Edelen, and the $8,500 in legal fees and costs he incurred for the eviction. He challenges each amount on two grounds, one factual and one legal. As we discuss, neither challenge has merit.

Edelen's factual challenge to the award of the $10,000 retainer is based on the timing of C.B.'s payment of the retainer. The receipt produced by C.B. showed the retainer was paid in July 2021, whereas the temporary restraining order was sought and granted in April 2021. Edelen argues the timing of the payment shows something is amiss, because "[a] retainer happens prior to the work being done."

Edelen fails to establish an abuse of discretion. C.B. testified the retainer he paid to the law firm represented legal fees for the civil restraining order protecting him as well as the apartment complex. This was prima facie evidence the $10,000 retainer was incurred to obtain the restraining order. Edelen did not cross examine C.B. about the timing of the payment. His appellate speculation that the timing of the payment seems wrong does not

19

provide this court with a basis for overturning the court's order. (*Mearns, supra*, 97 Cal.App.4th at p. 499.)

Edelen's factual challenge to the award of $8,500 in eviction fees and costs is also based on an asserted timing issue. Edelen argues his assault of C.B. "did not necessitate the eviction" but rather it was the eviction that "was the catalyst for the incident." In essence, he argues the eviction happened before, not after, the incident, such that the required causal nexus between the claimed economic loss and his criminal conduct is missing.

We reject this argument because it relies on an inaccurate characterization of the record. According to the evidence presented at the hearing, the "eviction" Edelen claims was the "catalyst for the incident" was actually a three-day notice. C.B. testified the document he served on Edelen immediately before the incident was a "three-day notice to get his act together or move out." After he was served with this notice, Edelen did not correct his behavior. He assaulted C.B., and then he assaulted other tenants. As C.B. explained, after he served the three-day notice on Edelen, "the incident happened . . . [and] tenants were very concerned. And once the three days had lapsed, we needed to get him out." It was at this juncture that C.B. asked one of his contract lawyers to file an unlawful detainer action. Edelen's claim that the eviction preceded, and was therefore insufficiently related to, his crimes fails to account for this evidence. He therefore fails to establish that the award " ' "has no relationship to the crime of which the offender was convicted." ' " (*Anderson, supra*, 50 Cal.4th at p. 32.)

Finally, Edelen challenges restitution of C.B.'s legal fees as a matter of law. Although his argument is not well developed, he essentially contends that it was improper for the court to order restitution of any of C.B.'s legal fees at all, because section 1202.4, subdivision (f)(3)(H), makes attorney fees

20

recoverable when incurred for collection of restitution, and C.B.'s $10,000 retainer and $8,500 in eviction fees and costs were not incurred for collection of restitution. The People respond that the court's exercise of discretion was appropriate under section 1203.1. Again, we would find no abuse under either statute.

Edelen's challenge relies on an overly narrow view of the authority granted by section 1202.4. It is true that section 1202.4, subdivision (f)(3)(H), lists "[a]ctual and reasonable attorney's fees *and other costs of collection* accrued by a private entity on behalf of the victim" (italics added) as one of the items of economic loss subject to reimbursement, which statutory language could be taken to limit restitution of attorney's fees to those fees incurred collecting money from the defendant. (See, e.g., *People v. Pinedo* (1998) 60 Cal.App.4th 1403, 1406 [legal fee incurred by victim to recover damages from the defendant's insurance carrier recoverable as restitution].)

However, our high court has made clear the list of losses in section 1202.4, subdivision (f)(3), is nonexclusive, and does not impliedly limit the categories of economic loss that can be recovered by a victim. (*Giordano*, *supra*, 42 Cal.4th at p. 660.) In *Kelly, supra,* 59 Cal.App.5th 1172, the Court of Appeal, relying on the breadth of a court's authority under section 1202.4, upheld a restitution order granting more than $220,000 in attorney fees and costs to the victim, Charles Schwab Co., Inc. (Schwab), even though they were incurred for something other than collecting money from the defendant. Rather, they were incurred to investigate and prove Kelly, a former Schwab employee, had violated a workplace restraining order, and to provide evidence to law enforcement and assist law enforcement in prosecuting Kelly. (*Kelly*, at pp. 1177–1178.) Kelly was ultimately convicted of the crimes of

21

false personation of another, unauthorized use of personal identifying information, and disobeying a court order. (*Id.* at p. 1177.)

On appeal, Kelly argued the trial court abused its discretion by granting restitution of Schwab's legal fees and costs because the award was not authorized by section 1202.4, subdivision (f)(3)(H). The Court of Appeal disagreed and held the fees and costs were proper because they were economic losses actually incurred by Schwab as a victim of Kelly's conduct. (*Kelly, supra,* 59 Cal.App.5th at p. 1178.) It observed that " '[b]ecause the statute uses the language "including, but not limited to" [the statutorily] enumerated losses, a trial court may compensate a victim *for any economic loss which is proved to be the direct result of the defendant's criminal behavior,* even if not specifically enumerated in the statute.' " (*Id.* at p. 1179.) Further, "[r]estitution may include expenses incurred to protect the crime victim from the defendant." (*Id.* at p. 1180.) "Awarding restitution to Schwab because it hired counsel to protect itself from a criminal course of conduct falls within the scope and remedial purpose of section 1202.4. Those fees and costs were ' "a logical result of appellant's criminal conduct.' " [Citation.] Failure to award them as restitution would be 'to fail to fully reimburse' the victim." (*Ibid.*)

Thus, contrary to Edelen's contention, notwithstanding the apparent limitation in section 1202.4, subdivision (f)(3)(H), the trial court did not lack authority to grant restitution of legal fees incurred for something other than the collection of restitution. This necessarily means the court also did not lack the legal authority to grant such fees under section 1203.1, since the scope of the trial court's discretion to award restitution is even broader under section 1203.1 than under section 1202.4. And for the reasons we have already discussed, Edelen fails to establish that the $10,000 retainer or

$8,500 in eviction fees and costs were insufficiently related to his criminal conduct to be awardable as restitution under section 1202.4 or 1203.1. As a result, he fails to establish that the court abused its discretion when it granted restitution of these losses.

## DISPOSITION

The order is affirmed.

DO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.