Filed 9/7/23

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E079444 |
| v. | (Super.Ct.No. FVI18002609) |
| ANTHONY NARRO, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. John P. Vander Feer, Judge. Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part A of the discussion.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel, Seth M. Friedman and Joseph C. Anagnos, Deputy Attorney Generals, for Plaintiff and Respondent.

Defendant and appellant Anthony Narro molested two of his stepdaughters and one of his stepdaughter's friends for a period of over 10 years. He was convicted of numerous sexual offenses and sentenced to 195 years to life. On appeal he contends (1) the judgment should be reversed because CALCRIM No. 1191B violated his right to due process under the Fourteenth Amendment of the federal Constitution by allowing jurors to rely on currently charged crimes to find he had the propensity to commit other currently charged crimes; and (2) the trial court erred by awarding restitution in the amount of $9,461.34 as noneconomic damages pursuant to Penal Code section 1202.4, subdivision (f)(3)(F)[1] in order for a victim's mother to replace the furniture where the molestations had occurred as the furniture invoked painful memories.

**FACTUAL AND PROCEDURAL HISTORY**

A.     <u>PROCEDURAL HISTORY</u>

Defendant was charged in a third amended information with committing multiple sexual offenses against multiple victims. Several counts involving Kaylin A., defendant's stepdaughter, were alleged to have occurred between January 2011 and September 2018. These counts included oral copulation or sexual penetration of a child

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

under the age of 10 (§ 288.7, subd. (b); counts 1, 2, 3, 5, 6); and committing a lewd act upon a child under the age of 14 (§ 288, subd. (a); counts 4, 7). It was further alleged for counts 4 and 7 that defendant had committed the offense of lewd act on a child under the age of 14 against more than one victim (§ 667.61, subds. (b) & (e)).

In count 8, defendant was charged with forcible rape of Jazmin W. on August 31, 2018 (§ 261, subd. (a)(2).) It was further alleged as to count 8 that defendant had committed forcible rape against more than one victim within the meaning of section 667.61 subdivisions (b), and (e).

Count 9 alleged that defendant committed the offense of a lewd act upon a child in violation of section 288, subdivision (a), against Rebecca W. in 2018. Defendant was charged in count 10 with a lewd act upon a child under the age of 14 (§ 288, subd. (a)) against Isabella K., occurring between July and August 2017. It was further alleged as to counts 9 and 10 that defendant had committed a lewd act against more than one victim within the meaning of section 667.61, subdivisions (b), and (e).

Counts 11 through 13 involved sexual offenses committed against Kassandra N. from 2003 through 2017. Counts 11 and 12 charged defendant with oral copulation or sexual penetration of a child under the age of 10 (§ 288.7, subd. (a)); count 13, charged defendant with committing a lewd act upon a child (§ 288, subd. (a)). Finally, count 14 charged defendant with committing a lewd act upon a child under the age of 14, Amanda B., on or about December 10, 2010, and December 31, 2010. It was further alleged as to counts 13 and 14 that defendant had committed a lewd act against more than one victim within the meaning of section 667.61, subdivisions (b) and (e).

3

Defendant was found guilty of all counts and special allegations except the jury was hung on the determination of count 8, the forcible rape of Jazmin. The prosecutor dismissed the charge. Defendant was sentenced to a total state prison sentence of 195 years to life. A victim restitution hearing was held, as will be discussed in more detail, *post*.

### B.     FACTUAL HISTORY

#### 1.     *PEOPLE'S CASE-IN-CHIEF*

##### a.     Kaylin (Counts 1-7)

Kaylin was 16 years old at the time of trial. Defendant had been married to her mother, Wendy. Defendant started touching Kaylin sexually when she was five years old. The first time he touched her they were living in La Habra. She had done something to get in trouble, but Wendy was not home to discipline her. Defendant asked if she wanted to do something for him rather than be punished. He asked her to "suck his dick." He unzipped his pants and put his penis in her mouth. He then pushed her head forward. This went on for some time until other people arrived home. Defendant told her not to tell anyone. She did not tell Wendy because she "[she] didn't know it was wrong. [She] just knew [she] wasn't going to get spanked."[2] Also when she was five years old, defendant was in her bedroom and started describing all of her body parts and kissing them. He kissed and licked her vagina. He tried to put his finger inside her

---

[2] Kaylin cried throughout her testimony.

4

vagina, but it hurt, and she told him to stop. He put his penis on her vagina and "started rubbing it . . . up and down."

Defendant made her orally copulate him once a week, licked her vagina and rubbed his penis on her vagina "countless" times when she was five years old. The acts would occur in her bedroom or in the living room if Wendy was not at the house. When she was six years old, he started showing her animated pornographic films. He came into her room at least once a week when she was six years old and made her orally copulate him. This occurred at least five times. He also licked her vagina and rubbed his penis on her vagina more than five times. He told her not to tell anyone.

When she was seven years old, he continued to commit the same sexual acts on her at least once each week. When she was eight and nine years old, he increased the frequency of the sexual acts to more than once each week. He would touch her late at night when everyone else was asleep.

When she was 10 years old, Wendy had to move to Needles, but Kaylin had to finish school before she could move. Kaylin and defendant stayed together alone in a house in Whittier. The sexual acts became more frequent because they shared a room. She finally moved with Wendy in Needles in sixth grade.

In 2017, she started having her friend Isabella over at her house. Defendant would let Isabella come over to the house if Kaylin agreed to orally copulate him. She had to orally copulate him about once a week in 2017. He had ejaculated in her mouth and she spit it out. Also during this time, he would make her lay down naked on a couch cushion that was in their den and he would rub his penis on her breasts and vagina.

Kaylin witnessed defendant touch Isabella and told him to stop. She also heard defendant comment on Isabella's breasts. Isabella stopped coming to her house in 2018. Isabella told Kaylin that defendant had grabbed her breasts when she got out of the shower.

Her other friend Rebeka started coming to her house all the time in 2017 and 2018. She had seen defendant tickle Rebeka and grab her breasts. In 2018, defendant continued to make Kaylin orally copulate him and rubbed his penis on her vagina. Finally, in July or August 2018, Kaylin texted defendant that she wanted him to stop touching her. He cried and told her he was sorry. Two weeks later he took off her pants and licked her vagina.

Eventually, Kaylin told Wendy what was happening, and Wendy called law enforcement. Kaylin finally told because her friends told her that he was also molesting them.

b.      Jazmin, Rebeka, and Isabella (Counts 8-10)

Isabella was 17 years old at the time of trial. Isabella was friends with Kaylin in sixth grade when she was 11 or 12 years old. She knew defendant as Kaylin's stepfather. Isabella frequently went to Kaylin's house in the summer of 2017. The first time defendant touched her, she was getting ready to take a shower and was having trouble getting the shower to work. Defendant came into the bathroom to help her and hugged her. He put his hands down her pants and squeezed her buttocks.

The second time defendant touched Isabella, she was in the bathroom getting ready to take a shower. Kaylin was using another bathroom to take a shower. Defendant

6

came into the bathroom to give Isabella a towel. He lifted Isabella's shirt. He touched his mouth to her breasts. He licked, sucked and bit her nipples. She tried to push him away but he would not stop. He finally got upset at her and left. She did not tell any adults because he told her not to tell anyone.[3] She indicated that defendant did this several times.

The next time defendant touched Isabella they were in his car. He picked her up and Kaylin was not in the car. He told her Kaylin was sleeping at home. While he was driving, he reached over and grabbed her breasts.

Isabella stayed the night at Kaylin's house that night. She, Kaylin and defendant sat on the couch watching a movie. While they were watching the movie, he told Kaylin and Isabella that they were going to have fun tonight and that they were going to put their mouths on his penis. Isabella moved away from defendant and close to Kaylin. Defendant grabbed or slapped Isabella's face. Isabella got up and went to the bedroom. She did not tell anyone. She was afraid of defendant because she had seen defendant be violent with members of his family.

Defendant asked Isabella another time to put her mouth on his penis. He also continued hugging her. He bit her breast through her shirt one time. She spoke with police in 2018 but it was at her school and she had a hard time talking about what happened to her.

---

[3] For the first time at trial, Isabella testified that defendant put his mouth on her breasts almost every time she was at their house.

Rebeka was 15 years old at the time of trial and had been best friends with Kaylin. She knew defendant as Kaylin's stepfather. Rebeka spent a lot of time at Kaylin's house during the summer of 2018. She would have been 11 years old. The first time defendant touched her, he said goodnight to her and kissed her on the lips. He grabbed her buttocks. She was scared and did not tell Kaylin. Defendant kissed her and grabbed her buttocks at least five times.

On one occasion in July 2018 she was getting ready to get into the shower and he came in and "groped" her chest. She was still wearing her bra and he groped her over the bra. She told him no and ran. She did not tell anyone. Defendant oftentimes made sexual comments to her, such as that she had big breasts or a "nice butt." She continued going to Kaylin's house because she wanted to be Kaylin's best friend.

Jazmin was 22 years old at the time of trial and was Rebeka's sister. She met defendant at his birthday party at the end of summer or fall of 2018 when she was 18 years old. Defendant asked Rebeka in front of Jazmin if Jazmin was his birthday present. After the party, Jazmin and Rebeka stayed the night at the house. Jazmin slept on the couch. At one point defendant came into the living room and started tickling her. She told him that she was not ticklish. She told him to stop but he did not. Defendant eventually went to his room that he shared with Wendy.

Jazmin woke up in the middle of the night to find defendant trying to take her pants off. He may have kissed her. She froze. She did not scream because she was afraid for Rebeka. He asked her if she was on birth control and she said no. He went and retrieved a condom. She did not get up and leave because she was panicked. Defendant

8

returned and put on the condom. He pushed her legs apart and put his penis in her vagina. Jazmin said nothing to defendant but she did not consent to defendant having sex with her. While he was penetrating her, Wendy came out and caught him. Defendant jumped up, told Jazmin he was sorry and went into the bedroom with Wendy.

Jazmin panicked and did not know what to do. Defendant and Wendy emerged from the bedroom. Defendant told Jazmin he was sorry and hugged her. Wendy told her that she loved her and that she forgave her. Jazmin took a shower because she felt "filthy." Jazmin did not tell Wendy that the sex was not consensual because she did not want to cause any problems.

Jazmin went back to sleep and went home the next morning. She later told Rebeka and Kaylin what had happened. Rebeka told Jazmin what had happened to her but they did not contact law enforcement. Kaylin disclosed several weeks later what defendant was doing to her. Kaylin eventually told Wendy, and law enforcement became involved.

c.     Kassandra (Counts 11-13)

Kassandra was born in November 1997, and was 24 years old at the time of trial. Defendant had been her stepfather. The last time she saw defendant in person was in 2008 when she was 10 years old. They lived in Los Angeles County when defendant was married to her mother. The first time defendant touched her, when she was seven or eight years old, they were at a hotel. He took off her clothes and rubbed her vagina and breasts while she was in the shower. He took her to the bed and touched the same places. Approximately one year later, he again rubbed her breasts and vagina. She believed it

9

was March or April 2008. He also penetrated her vagina with his fingers and put his mouth on her vagina. She cried and screamed. She tried to get away from defendant but he was too strong. She was scared of him because at the time he would punch her hard causing bruises.

Kassandra stated defendant would commit these acts almost every day that she was not at school. He put his mouth on her vagina only a couple of times. She did not tell anyone because she was scared and did not know what was happening to her. The sexual acts stopped when Kassandra's grandfather walked in on defendant and her on the couch. She told her mother; defendant left the home and she never saw him again. She spoke with the police in 2008 but nothing happened to defendant.

Kassandra's mother testified that she and defendant were married in 2005 and that he took care of Kassandra while she was at work. She ended her marriage with defendant based on things that Kassandra told her about defendant.

d.      Amanda B. (Count 14)

Amanda B. was 22 years old at the time of trial. When she was 10 or 11 years old, defendant was a family friend. Amanda called defendant Uncle Anthony. Defendant was married to Wendy at the time. One night, Amanda's mother left her with Wendy and defendant while she went out on a date. Kaylin was only four or five years old at the time and she could not recall if Kaylin was at the apartment that night. Wendy was not home.

Amanda and defendant sat on the couch in the living room and watched a movie. He reached under her shirt and touched both of her breasts. He also reached down her

pants and touched her buttocks. She told him to stop but he refused. He eventually stopped and she went to sleep in one of the bedrooms. She woke up and defendant was lying beside her with his hand in her pants. He put one or two fingers inside her vagina. It hurt and she was scared. He also moved his hand and touched her breasts. She froze and did not say anything. She waited several days until she told anyone what had happened.[4]

### 5.  *EVIDENCE RELEVANT TO ALL COUNTS*

The prosecution also presented the testimony of Dr. Veronica Thomas regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). She described CSAAS as a disclosure pattern by victims of child abuse. It was a therapy tool but it was not a diagnostic tool. There were commonalities among victims of child sex abuse, which included secrecy, helplessness, accommodation or repression, disclosure and recanting. Each child would remember incidents of sexual abuse based on their ability to recall their experience. It was possible for victims to exaggerate the child sexual abuse but they could also underreport. Dr. Thomas did not speak with any of the victims in the case.

Wendy testified that she and defendant moved in together in September 2009 and married in June 2010. They had lived in several cities since they had been married before they settled in Needles. Defendant lived with Kaylin from 2009 to 2018.

---

**4** Amanda spoke with the police in 2010 and 2018. She described defendant touching her vagina and using circular motions and not that he digitally penetrated her.

B.    DEFENSE

Wendy was recalled by the defense.  She met defendant when Kaylin was five years old.  Wendy had been contacted by the La Habra police about Amanda accusing defendant of touching her inappropriately in December 2010.  Wendy told the police officer that she had been home with Amanda and defendant and nothing had happened but at trial she admitted that she was not at the house the entire time Amanda was with defendant.

Wendy indicated that defendant wrestled with the children all the time.  It was just for fun and to teach them to defend themselves.  She did not think it was sexual.  Kaylin had asked Wendy some sexual questions when she was young but Wendy assumed that it was because Kaylin had walked in on her and defendant while they were having sex.  She had no idea that the abuse was occurring between 2010 and 2018.

Wendy recalled that Isabella and Rebeka had used the shower in the bathroom attached to her bedroom but did not see defendant also enter the bathroom with them.  Wendy had seen defendant on top of Jazmin with his pants down on the night of his birthday party.  She contemplated divorcing him.

La Habra Police Lieutenant Jose Rocha police testified about the investigation of the case involving Amanda.  He interviewed Wendy at the time.  She told him that Amanda's allegations did not make sense and that she never left Amanda alone with defendant.

12

Kaylin's father testified. He had been married to Wendy. He had known Wendy since 1999. Kaylin's father believed that Wendy was a very manipulative person and was not truthful. It was his opinion that Kaylin had been manipulated by Wendy.

Defendant testified on his own behalf. Kassandra was his stepdaughter in 2008. He lived with Kassandra and her mother in a room in a house that was occupied by several other people. He denied that he touched her inappropriately.

Kassandra's mother told defendant to leave the family home, and he met Wendy. Defendant denied that when he was alone with Kaylin that he touched her inappropriately. Defendant recalled that Kaylin had walked in on him and Wendy several times while they were engaged in sexual relations.

He denied that he was ever alone with Amanda. He never went into the bedroom where she was sleeping in the middle of the night.[5] Defendant was questioned by the La Habra Police Department regarding Amanda's accusations and denied that anything had happened with her. He told the police that Amanda had made similar accusations against other men. Charges were not brought against him. Defendant wrestled and tickled Amanda as he did with Kaylin and his son.

Defendant insisted that Wendy was always home working on her computer. He was rarely left alone with Kaylin. He denied he ever sexually inappropriately touched Kaylin. He never went into her room in the middle of the night. He never made her

---

[5] On cross-examination, defendant admitted that he took Amanda to the store. They were alone driving there and back. They were also alone in the house for a period of time while Wendy was at a meeting.

13

perform sexual acts instead of disciplining her. He admitted that he and Kaylin lived just the two of them for a period of time and stayed in the same room. He denied he ever touched her sexually. Wendy found defendant and Kaylin wrestling on her bed one time and asked what he was doing.

He was alone a few times with Isabella in his car and it was common for Isabella to take a shower at their house. He denied ever making sexually explicit comments to Isabella or touching her. He did tickle and wrestle with Isabella but only when other people were present. He also admitted to being in the bathroom alone with Isabella when she would take a shower to help her start the shower or to give her a towel. He tickled and wrestled with Rebeka.

Defendant admitted having sexual intercourse with Jazmin but he believed it was consensual. Defendant believed that Kaylin and the other girls were mad at him for cheating on Wendy with Jazmin. Kaylin only made the accusations because she was upset he cheated on Wendy. During a pretext phone call, Kaylin accused defendant of forcing her to orally copulate him and saying sexually inappropriate things to her for eight years. Defendant responded that it happened a long time ago and that he was a "dumb ass." He insisted he was talking about hurting her while they were wrestling even though Kaylin never brought this up. He insisted he apologized throughout the pretext phone call for having had sex with Jazmin and not because he molested Kaylin.

14

**DISCUSSION**

A.   <u>CALCRIM NO. 1191B</u>

Defendant contends, despite established California Supreme Court precedent affirming the instruction, that by instructing the jury with CALCRIM No. 1191B, which allowed the jury to consider its finding of guilt on one currently charged sexual offense to show that he had the propensity to commit the other currently charged sexual offenses, the trial court violated his Fourteenth Amendment rights to due process and a fair trial. Defendant insists that all of his convictions should be reversed due to the giving of the instruction, or in the alternative, counts 11, 12, 13 and 14 should be reversed.

1.   *ADDITIONAL FACTUAL HISTORY*

After defense counsel finished his closing argument, the parties met outside the presence of the jury and the trial court noted that it had inadvertently not given CALCRIM No. 1191B. Defense counsel stated on the record, "Object and submit." The trial court agreed to give the instruction after the prosecutor's rebuttal argument.

The jury was instructed with CALCRIM No. 1191B as follows: "The People presented evidence that the defendant committed the crimes of oral copulation or sexual penetration with child 10 years old or younger, charged in Counts 1, 2, 3, 5, 6, 11, 12; forcible rape charged in Count 8; and lewd act upon a child under age 14 in counts 4, 7, 9, 10, 13, and 14.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and

15

based on that decision, also conclude that the defendant was likely to commit the other sex offenses charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge beyond a reasonable doubt."

2.      *WAIVER*

Defendant argues on appeal that despite being aware that in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), the California Supreme Court approved of CALCRIM No. 1191B, he brings this appeal to preserve his federal constitutional claim that his Fourteenth Amendment rights to due process and a fundamentally fair trial were violated by the trial court so instructing the jury. As noted by the People, defendant never objected in the trial court on federal constitutional grounds. "It is elementary that defendant waived these claims by failing to articulate an objection on federal constitutional grounds below." (*People v. Burgener* (2003) 29 Cal.4th 833, 886.)

Defendant insists that any objection would have been futile based on the established California Supreme Court precedent. Even if we were to consider defendant's claim on appeal, it lacks merit.

"Pursuant to Evidence Code section 1108, pattern jury instruction CALCRIM No. 1191 explains to a jury that it may consider a defendant's *uncharged* sexual offense as evidence of his or her propensity to commit a charged sexual offense." (*Villatoro, supra*, 54 Cal.4th at p. 1156, italics added, fn. omitted.) The Supreme Court held in *Villatoro*

16

that Evidence Code section 1108 also applied to charged offenses and that CALCRIM No. 1191, as modified by the trial court to include language that it applied to charged offenses, properly instructed a jury that a defendant's commission of some of the charged sexual offenses in a case may be considered as evidence of the defendant's propensity to commit the other charged sexual offenses. (*Villatoro*, at pp. 1156, 1159-1168.)

As recognized by defendant, we are bound to follow the majority opinion in *Villatoro*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see also *People v Meneses* (2019) 41 Cal.App.5th 63, 67-68 [defendant's claim of a violation of due process by the trial court instructing the jury with CALCRIM No. 1191B was foreclosed by *Villatoro*].) We cannot grant defendant relief on his claim of a violation of his federal due process rights in light of *Villatoro*. Defendant may petition the California Supreme Court for review and ask that court reconsider *Villatoro* and, if appropriate, present his federal due process claims in an appropriate proceeding.

B.    RESTITUTION

Defendant contends the trial court erred by awarding Kaylin's mother the amount of $9,461.34 as restitution to purchase new beds and living room furniture, which she claimed caused painful memories of defendant's sexual abuse of Kaylin.

1.    *ADDITIONAL FACTUAL BACKGROUND*

At sentencing, defense counsel requested a hearing on restitution because of the amounts involved. Wendy had filed a request for restitution with the trial court to be paid for her costs to replace furniture that was causing bad memories for her and Kaylin because the sexual acts were committed on or around this furniture. She stated, "Every

17

time we looked at it or sat on it; reminded us of the defendant and how he tortured us mentally, physically, emotionally, and sexually."

On September 26, 2022, defendant filed a restitution brief objecting to the request made by Wendy that the trial court order defendant to pay her the amount of $9,461.34 to be reimbursed for new beds for her and Kaylin, and new living room furniture. Defendant acknowledged that subdivision (f) of section 1202.4 provided that Kaylin was entitled to all economic losses suffered as a result of a defendant's conduct. Further, as a victim of sexual abuse, Kaylin was also entitled to noneconomic losses. However, the crime in this case did not damage or destroy the furniture. As such, Wendy was not entitled to reimbursement as an economic loss. Moreover, Wendy was not entitled to reimbursement for the noneconomic loss, the painful memories suffered by Kaylin.

The matter was heard on November 18, 2022. The trial court noted the hearing was in regard to victim restitution requested by Wendy. She was seeking restitution for the purchase of new beds for her and Kaylin, and new living room furniture. The items were not damaged but carried with them memories of what defendant had done to Kaylin. The trial court noted that section 1202.4 included both economic and noneconomic damages. The trial court was concerned about awarding economic damages for a noneconomic loss, which was the pain and suffering.

The prosecutor argued that the losses were due to the commission of the crimes in the case. The sexual acts occurred on this furniture. The furniture qualified under section 1202.4, subdivision (f). The trial court had broad discretion to set the restitution amount. The furniture could no longer be used by the victim. Further, a parent of a child

18

was entitled to noneconomic damages. Noneconomic damages included psychological harm. At the hearing, defense counsel relied on his written brief. He argued that this was not an economic loss. The furniture was still functional. Defense counsel questioned where the damages would end.

On November 23, 2022, the trial court issued a written ruling. It recognized that Wendy was seeking restitution for the new furniture purchased based on the fact that the crimes took place on the furniture and caused "devastating memories." The trial court also noted that Kaylin was a minor and Wendy was her mother. Further, section 1202.4, subdivision (f)(3)(F), provided that victims of section 288 and 288.7 crimes were entitled to compensation for noneconomic losses for psychological harm. The language of the statute allowed for Wendy, as Kaylin's parent, to be awarded restitution for noneconomic losses. The trial court imposed the restitution fine in the amount $9,461.34.

2.    *ANALYSIS*

Section 1202.4, subdivision (f), requires the trial court to order the defendant to pay restitution to the victim "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1).) Section 1202.4, subdivision (f)(3)(F), provides for restitution for, "Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7."

19

"With one exception, restitution orders are limited to the victim's economic damages.  The exception is for '[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288.'

"Economic damages are 'objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.'  [Citation.]  Noneconomic damages are 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' " (*People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*).)

"By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are 'rationally designed to determine the . . . victim's economic loss." [Citation.]  Noneconomic damages, however, require more subjective considerations." (*Smith*, *supra*, 198 Cal.App.4th at p. 436.)  No fixed standard exists for deciding the amount of noneconomic damages.  (*People v. Lehman* (2016) 247 Cal.App.4th 795, 801.)  We review the amount of restitution for noneconomic losses ordered for abuse of discretion.  (*Ibid*.)

Numerous courts have upheld noneconomic loss awards for cases involving sexual abuse that are considerably higher than the award in this case and were based only on evidence of psychological trauma.  (*People v. Lehman*, *supra*, 247 Cal.App.4th at p. 802 [appellate court found the trial court properly determined that "Jane Doe 1 was entitled to

20

$900,000 in noneconomic restitution because of the psychological impact of defendant's abuse."]; *People v. McCarthy* (2016) 244 Cal.App.4th 1096, 1102, 1110-1113 [in a case involving continuous sexual abuse of a child, the appellate court upheld award of "$100,000 per year for 10 years, for a total award of $1 million"]; and *Smith*, *supra*,198 Cal.App.4th at pp. 436-437 ["[W]e conclude that the restitution order for $750,000 in noneconomic damages for years of sexual abuse does not shock the conscience or suggest passion, prejudice or corruption on the part of the trial court"].)

Initially, we disagree with defendant that the loss here was a purely economic loss and that since the furniture was still functional, the trial court erred by awarding the restitution. Here, Wendy requested that the trial court award her $9,461.34 to reimburse her for furniture she had purchased to replace certain items of furniture in her house. There is no dispute that the sexual molestations occurred on this furniture. Wendy averred that the furniture was a constant reminder of the sexual abuse committed by defendant.

Such evidence of the amount to reimburse Wendy for the cost of the furniture was unnecessary in order for Kaylin and Wendy to be entitled to noneconomic damages based on the psychological trauma suffered due to defendant's actions. Kaylin was entitled to noneconomic losses based on the psychological trauma suffered. As noted in the above cases, that amount need not be tied to any specific damages, but rather the trial court, within its discretion, tries to determine the appropriate compensation for such pain and suffering. Kaylin could have requested a much higher amount based on the years of sexual abuse suffered at the hands of defendant. Kaylin was entitled to noneconomic

21

damages and could spend the money as she saw fit in order to help heal her emotional damage. The trial court did not error by awarding Kaylin $9,461.34 restitution.

### DISPOSITION

The judgment is affirmed in full.

CERTIFIED FOR PARTIAL PUBLICATION

MILLER

J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.