Filed 1/26/24  P. v. Ruiz CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GERARDO JAUREGUI RUIZ,<br><br>Defendant and Appellant. | F085350<br><br>(Super. Ct. No. 17CR-02652)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Steven K. Slocum, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Gerardo Jauregui Ruiz was convicted of multiple counts of oral copulation and sodomy of a child under 10 and one count of dissuading a witness from reporting a crime.  Ruiz was sentenced to 80 years to life in prison.  On appeal, he argues

a witness was improperly permitted to offer expert testimony, the trial court improperly declined his request to address the court at sentencing, and the trial court imposed restitution without first considering his ability to pay. We affirm.

## PROCEDURAL HISTORY

On November 16, 2021, the Merced County District Attorney charged Ruiz with two counts of sodomy of a child 10 years old or younger (Pen. Code § 288.7, subd. (a);[1] count 1-2), two counts of oral copulation with a child 10 years old or younger (§ 288.7, subd. (b); counts 3-4), and one count of dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 5.)

Following a jury trial, Ruiz was found guilty on all counts. On November 29, 2022, he was sentenced to 25 years to life on counts one and two, 15 years to life on counts three and four, to run consecutively, and a concurrent two year term on count five, for a total sentence of 80 years to life.

The trial court further imposed a restitution fine of $10,000 (§ 1202.4), a facilities assessment fee of $150 (Gov. Code, § 70373), and a court operations assessment of $200 (§ 1465.8.)

## STATEMENT OF FACTS

We summarize the facts underlying Ruiz's conviction as they are not directly relevant to the issues on appeal.

In 2016, Ruiz allowed his sister, H., and her two daughters and son, C., to move into his home. H. and Ruiz's nieces slept in the bedroom, while Ruiz and C. slept in the converted garage. C. was eight years old at the time.

About three weeks after H. moved in, Ruiz began sexually abusing C. Over the course of the following three weeks, Ruiz forced C. to orally copulate him on approximately 14 occasions. Ruiz also sodomized C. on approximately 12 occasions.

---

[1] Unspecified references are to the Penal Code.

2.

After each assault, Ruiz warned C. not to tell his mother H.  The sexual assaults left C. in physical pain, and he ultimately told H.  H. confronted Ruiz about the abuse.  Ruiz asked for forgiveness and pleaded with her not to turn him in, saying that two men should not sleep in the same bedroom because those things happen.  Ruiz also told C., "I told you not to tell her because you were going to make your mother suffer."

Ruiz and H. exchanged a number of text messages.  Ruiz texted, "[H.], it was never my intention.  I swear to you that I did not harm.  Please don't turn me in.  If you do it, I'm going to commit suicide."  H. responded, "I'm not going to turn you in.  But please, don't ever get close or come near to one of my children, ever."  Ruiz responded, "I swear to you that I will never get close.  And it is never my intention to cause you that harm."  H. responded, "Okay."  Ruiz replied, "Thank you.  I cannot stop crying.  Please tell Ene to not say, please."  Ruiz also replied, "[H.], please, [H.], it was not my intention.  I swear to you that I was asleep.  Don't do this to me, please.  You're going to cause more harm to others than to me."

Diana Gomez-Silvas (Silvas), a nurse, conducted a sexual assault forensic (SART) exam on C.  However, she did not make any findings of sodomy during the exam.  Finally, C. also testified about the abuse.

## DISCUSSION

### I.     The SART Nurse Did Not Improperly Offer Expert Opinions

Ruiz argues that Silvas was allowed to give improper expert opinion about the rate of finding evidence of sodomy during SART exams, and the rate at which injuries to the anus typically heal, by testifying about her personal experience as a SART nurse.  We disagree.

### A. Background

Prior to Silvas testifying before the jury, the trial court held an Evidence Code section 402 hearing to determine the scope of Silvas's expertise.  Silvas testified she was a pediatric nurse for seven years and performed an estimated 150 SART exams, of which

80 were cases of sodomy involving victims age 10 and under. Based on her experience, Silvas opined that injuries to the anus in young children would sometimes heal within 24-48 hours. She recalled two specific instances where she examined a child with injuries to the anus, and during the follow up exam two to five days later, the injuries had healed.

The court ruled:

> "COURT: I don't think that the witness can testify that an injury to the anus is going to heal within 24 to 48 hours and, therefore, not be present. Just generally I don't think there's enough foundation for that opinion. I think that would take a medical doctor to opine to that and probably quite a few peer-reviewed studies on various injuries and, you know, looking at it on day one, day two, day three, and documenting the healing process over time. So I don't think this is enough foundation for that opinion.
>
> …
>
> "I think she can testify generally about what she's observed. That was my tentative. She can testify about the number of examinations that she's conducted and how frequently she has seen findings. But I would narrow it down to the times – we're talking about a sodomy case. Because I don't think vaginal or other issues are relevant in this case.
>
> "PROSECUTOR: Right. And she said that when – children under 10, she had done about 150 SART exams. Of that, 80 were for suspected sodomy. And of that she has located, maybe five to ten times, findings.
>
> …
>
> "I also would ask that she be able to testify to the situations where she had a finding or injury and then had the child come back in a couple of days later and saw that the injury had healed. She said she did that one to two times. I think that's relevant in her experience.
>
> "COURT: Okay. I tend to agree with you."

Silvas then testified about the specifics of the two incidents where the injury healed between the initial and follow up visit. The court concluded:

> "COURT: Ms. Silvas, I'll order that you can basically testify about your own personal experiences. … And the DA is going to focus in on what you've done, what you have seen. But no generalized medical opinions, like it's – like, let me give you an example. I wouldn't allow you to testify that generally there are no findings in children who are sodomized. Okay? That would be outside the scope of your expertise.
>
> "I wouldn't allow you to testify that all – almost all injuries heal within 24 to 48 hours, either. Okay?
>
> "But outside of that, you can testify about your own observations, the examinations you have conducted. And I think the DA is going to focus on these 80 sodomy cases because that's really what's relevant in the case before us."

Silvas testified before the jury and was offered as an expert in sexual assault examinations in children over Ruiz's objection. Silvas testified about her experiences in relevant part:

> "Q: I want to go back to the SART exams that you said. You've done about 80 SART exams where you have examined a child's anus?
>
> "A: Correct.
>
> "Q: Of – and I'm talking about a child under the age of 10. Is that correct, the 80?
>
> "A: Correct.
>                                        …
>
> "Q: So in the 80 exams that we're discussing, were those examinations of a child's anus where sodomy was suspected?
>
> "A: Correct.

5.

"Q: And that was suspected sodomy in a child under the age of 10?

"A: Correct.

"Q: All right.  So out of those 80 exams of a child under 10 with suspected sodomy, how many times did you locate a finding?

"A: Once or twice.

"Q: Once or twice or was it – I'm not talking about incidents where you might have had future contact with a patient but just examinations themselves where they've had suspected findings.

…

"A: Maybe less than ten, estimate.

"Q: So less than ten times you, out of the 80 suspected sodomy anal examinations of a child under 10, less than ten times have you found a finding or injury?

"A: Yes.

"Q: Now out of those 80 – well before I go there, let me ask you: When a child comes in, let's say a child under the age of 10, where you have suspected sodomy and you have done an exam and found a finding, do you ever ask that that child come back for a follow-up appointment?

"A: Yes.

"Q: Okay.  And what is the reason for doing that?

"A: For photos, that we do take photos, follow up to see if there's any scarring or anything that maybe I had missed on my prior exam, and they are noted.  So it's possible findings or not findings.

"Q: And so typically if a child comes back for the follow-up exam, how long after the initial exam do they come back?

"A: Anywhere from two to four – two to five days.

"Q: Okay. So have you ever had a child under the age of 10 where sodomy was suspected and you had a finding at that initial exam and then had that same child come back that you re-examined again during that two- to five-day period?

"A: Yes.

"Q: Okay. So on – on that incident, what – what was the suspected – what was suspected as penetrating the child's anus?

…

"A: Penis and fingers.

"Q: Okay, so let's talk about – so you had two times?

"A: Correct."

Silvas then described the two incidents. Silvas testified that if she had only attended the children described in the two incidents during their follow-up exam, she would have concluded there were no findings of injury. Following Silvas's testimony, the court stated the following outside the presence of the jury:

"And I just wanted to make a little bit of a record regarding the testimony of Ms. Silvas and the Court's ruling regarding her observations of approximately 80 children who are aged 10 or under where the suspected mechanism was sodomy or forceful penetration of the anus. The defense has objected.

"I appreciate that, [counsel]. I know you're just doing your job.

"We had a 402 hearing on the issue, too, but the Court's – I just want to make a record that in my view, this is

an area that's well outside of the common knowledge of any person.  This witness has conducted numerous examinations.  And the jury obviously wouldn't have any information about what it looks like when a child's anus is penetrated, if that would – I would think that a common person might think that would leave a severe injury, and you would expect to see an injury.

"So one of the major issues in the case is did a sodomy occur, and that's for the jury to decide, and whether or not – in this case, there were no findings.  So that's obviously a fact that may tend to show a sodomy didn't occur.

"But with this expert's training and experience, the jury can better understand the nature of either forcible penetration or sodomy and whether or not that does cause injury.  And, if so, whether or not that heals.

"So I think these are important facts for the jury to hear and well outside the common experience.  And under 352, I find it's highly probative, and it's not substantially outweighed by the probability that its admission would necessitate undue consumption of time, create substantial danger of undue prejudice, or confuse the issues or mislead the jury."

## B.  Legal Standard

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates.  Whether a person qualifies as an expert in a particular case, however, depends upon the facts of the case and the witness' qualifications.  [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown."  (*People v. Bloyd* (1987) 43 Cal.3d 333, 357.)

An expert witness may testify in the form of an opinion when their testimony is related to a subject that is sufficiently beyond common experience that the opinion would assist a trier of fact, and the opinion is based on a matter perceived by or personally

8.

known to the witness or made known to him or her before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion. (Evid. Code, § 801.) "[T]he trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*People v. Lund* (2021) 64 Cal.App.5th 1119, 1138.)

Otherwise, a witness is able to testify on matters within their personal knowledge. (Evid. Code, § 702, subd. (a).) The testimony must relate to "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Wheeler* (1992) 4 Cal.4th 284, 295.) A trial court may nonetheless exclude relevant evidence if its probative value is substantially outweighed by its potential for prejudice, confusion, or undue consumption of time. (Evid. Code, § 352.) "Like any other witness, experts can relate what they have personally observed .…" (*People v. Valencia* (2021) 11 Cal.5th 818, 831, fn. 13 (*Valencia*).) We likewise review rulings regarding relevancy and Evidence Code section 352 under an abuse of discretion standard. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)

## C. Analysis

Ruiz argues Silvas's testimony constituted inadmissible expert opinion testimony, because her personal experience indirectly conveyed a medical opinion to the jury on the rarity of observing findings of sodomy during SART exams.

Silvas was admitted as an expert on sexual assault examinations in children. In that capacity, Silvas testified about the general procedures of SART examinations, as well as about the examination she conducted on C. Pursuant to the court's ruling at the Evidence Code section 402 hearing, Silvas then testified about her specific experiences conducting SART exams on children under the age of 10 where sodomy was suspected. Silvas also described two particular cases where she conducted a SART exam of a child

9.

under the age of 10, where sodomy was suspected and injury was initially present, but no injury was found during a follow-up examination two to five days later. Following that testimony, the prosecution did not ask Silvas to give any generalized opinions about her observations.

A review of the record does not reveal that Silvas explicitly offered an opinion about the rarity of findings of sodomy in SART exams. Silvas's testimony was limited only to her specific, personal experience conducting SART exams, and her specific observations in two relevant cases. Ruiz likewise does not cite to any caselaw supporting his proposition that an expert witness's testimony about their specific, personal observations can implicitly rise to the level of an expert opinion. Experts, like all witnesses, are permitted to testify on matters they personally observed. (*Valencia, supra*, 11 Cal.5th at p. 831, fn. 13.) If that testimony might confuse or mislead the jury, its admissibility is properly resolved pursuant to Evidence Code section 352.

The trial court in this case ruled Silvas's testimony regarding her personal experience with SART exams on children under the age of 10 where sodomy was suspected was relevant and admissible pursuant to Evidence Code section 352. The court found Silvas's testimony about her experience "highly probative" and "not substantially outweighed by the probability that its admission would necessitate undue consumption of time, create substantial danger of undue prejudice, or confuse the issues or mislead the jury." Ruiz does not appear to challenge that ruling.

No impermissible expert opinion was given in this case on the rarity of observing findings of sodomy during SART exams in children under age 10, because Silvas did not give an opinion on the matter. She only testified as to her personal experience with SART exams in the aforementioned category and the trial court found that testimony admissible as relevant and probative evidence within Silvas's personal knowledge.

## II. The Trial Court Did Not Err In Denying Ruiz's Request To Personally Address The Court At Sentencing

Ruiz argues the court erroneously denied his request to personally address the court at sentencing, in violation of his federal and state due process rights. We find no error, and had error occurred, no prejudice.

### A. Background

At the sentencing hearing on November 29, 2022, after the court announced its tentative sentence, the court had the following exchange with Ruiz's trial counsel:

> "DEFENSE COUNSEL: Your Honor, my client, as well as his son, Gerardo Ruiz, Junior, would like to address the Court.
>
> "COURT: Okay. Your client may address the Court if he's sworn under oath; otherwise, if he's stating factors in mitigation – what's the purpose of his statement?
>
> "RUIZ: Can I have a chance to talk to him?
>
> "COURT: Sure.
>
> "COURT: [Counsel], do you have an offer of proof of what he would like to tell the Court?
>
> "DEFENSE COUNSEL: He maintains his innocence. And that's the reason he went to trial.
>
> "COURT: Okay. Understood. Otherwise, I don't think he has a right to make a statement to the Court at sentencing unless he wants to offer some factors in mitigation. [Prosecutor]?
>
> "PROSECUTOR: No, Judge. I would agree. And absent that, I would ask that his addressing the Court on his issue of innocence not be allowed.
>
> "COURT: Okay. All right. With that offer of proof, I'm going to decline to hear from Mr. Ruiz or his son. Okay. I have read the letters from the family, though, and they also

11.

state that it's their belief that he's been wrongfully convicted, at least in, I think, two of the three letters. Okay. [Counsel], regarding the sentence, anything further?

"DEFENSE COUNSEL: I was also going to mention that he is asking for the Court's mercy at sentencing.

…

"COURT: Okay. All right. I appreciate the requests. I understand that the family of the defendant may have, you know, heard the version of events from their family member, but the Court was present for the trial and the testimony of [C.], and I found his testimony to be compelling. I find that there were multiple acts, horrific acts of child abuse that occurred over a lengthy period of time on numerous different days. And I think this is the correct sentence."

## B. Legal Standard

A court's inquiry into whether a defendant has any cause to show why sentence should not be pronounced is traditionally called an allocution. (*People v. Cross* (1963) 213 Cal.App.2d 678, 681.) Section 1200 governs such statements and permits a defendant to provide *legal* cause to show why judgment should not be pronounced. A statement of mitigating factors in turn falls within section 1204 which states,

"The circumstances [in aggravation or mitigation] shall be presented by the testimony of witnesses examined in open court. … No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the court, or a judge thereof, in aggravation or mitigation of the punishment, except as provided in this and the preceding section. This section shall not be construed to prohibit the filing of a written report by a defendant or defendant's counsel on behalf of a defendant if such a report presents a study of his background and personality and suggests a rehabilitation program."

"By stating in section 1204 that mitigating evidence must be presented through 'the testimony of witnesses examined in open court' rather than verbal representations,

12.

the Legislature has declared that a criminal defendant wishing to make an oral statement to the court in mitigation of punishment must do so through testimony given under oath." (*People v. Evans* (2008) 44 Cal.4th 590, 598 (*Evans*).) "[A] trial court that prefers to proceed more informally may, *with the parties' consent*, choose not to have the defendant testify under oath and instead allow the defendant to make a brief unsworn statement urging lesser punishment." (*Id.* at p. 599)

A defendant does not have a federal due process right to make a personal unsworn statement at a sentencing hearing. " 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." [Citation.] California law, through section 1204, gives a criminal defendant the right at sentencing to make a *sworn* personal statement in mitigation that is *subject to cross-examination* by the prosecution. This affords the defendant a meaningful opportunity to be heard and thus does not violate any of defendant's rights under the federal Constitution.' " (*Evans, supra,* 44 Cal.4th at p. 600.)

### C. Analysis

Ruiz wanted to address the court to state that he maintains his innocence and that is the reason he went to trial, and to request the court's mercy at sentencing. Ruiz did not confirm he was willing to make the statement under oath and subject to cross-examination and did not request that he be called to the stand after the court declined to hear his unsworn statement. Nonetheless, the trial court noted both Ruiz's and his family's affirmation of his innocence, and Ruiz's request for mercy.

The trial court did not violate Ruiz's due process rights by declining to hear his statement at sentencing, because Ruiz failed to satisfy the requirements of section 1204. Primarily, nothing in the record indicates Ruiz was willing to make a statement under oath and subject to cross-examination. The court told Ruiz's attorney, "[y]our client may address the Court if he's sworn under oath; otherwise if he's stating factors in

13.

mitigation ….." At no point following the court's admonition did Ruiz indicate he was willing to make a statement under oath.

Likewise, California Rules of Court, rule 4.423 describes circumstances in mitigation which Ruiz may have presented to the court. "Any circumstances in aggravation or mitigation, whether or not the factors have been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial, may be considered in deciding whether to impose consecutive rather than concurrent sentences …." (Cal. Rules of Court, rule 4.425, subd. (b).)

Ruiz argues a plea for mercy falls within these factors. He relies on an excerpt from *Evans, supra,* 44 Cal.4th at p. 596, discussing the history of allocution, which draws from an 1847 treatise on criminal law and reads " 'It is now indispensably necessary, even in clergyable felonies, that the defendant should be asked by the clerk if he has any thing to say why judgment of death should not be pronounced on him. … *If he has nothing to urge in bar, he frequently addresses the court in mitigation of his conduct, and desires their intercession with the king, or casts himself upon their mercy*.' "

Ruiz further relies on the dissenting opinion in *California v. Brown* (1987) 479 U.S. 528, 561-562 (dis. opn. of Blackmun, J.), which states, "While the sentencer's decision to accord life to a defendant at times might be a rational or moral one, it also may arise from the defendant's appeal to the sentencer's sympathy or mercy, human qualities that are undeniably emotional in nature. [Citation.] In a capital sentencing proceeding, the sentencer's discretion must be guided to avoid arbitrary or irrational decisions. [Citation.] When a jury serves as the sentencing authority, such guidance is provided, in part, through jury instructions. This Court, however, has recognized and even safeguarded the sentencer's power to exercise its mercy to spare the defendant's life."

Neither of these excerpts apply to the instant case. Section 1204 has now superseded 19th century law, and "[c]apital cases are governed by a sentencing scheme

14.

unique to those cases." (*Evans, supra,* 44 Cal.4th at p. 599.)  This is not a capital case. Even if this court accepts that Ruiz was willing to make his statement under oath, a generalized declaration of innocence and plea for mercy are not mitigating factors pursuant to California Rules of Court, rule 4.423.  And, a review of California Rules of Court, rule 4.423 does not reveal any mitigating factors which appear to apply to this case based on the available record.

Finally, if the trial court declining to hear Ruiz's statement was error, such error was harmless.  (*People v. Falcon* (2023) 92 Cal.App.5th 911, 950, see also *People v. Watson* (2008) 43 Cal.4th 652, 693.)  The court indicated that it found C.'s testimony compelling, and that there were "multiple acts, horrific acts of child abuse that occurred over a lengthy period of time on numerous different days."  The court concluded that it believed the 80-years-to-life sentence was correct.

Ruiz argues that had he the opportunity to argue for mercy, the court could have shown slight mercy by running one or more of his life sentences concurrent rather than consecutive.  Ruiz argues that even a sentence of 65 years to life would hardly be lenient.

"It requires no citation of authority that a sentencing judge is required to base his decision on the statutory and rule criteria, on an analysis of legitimate aggravating and mitigating factors, and *not* on his subjective feeling about whether the sentence thus arrived at seems too long, too short, or just right.  He is not permitted to reason backward to justify a particular length sentence which he arbitrarily determines." (*People v. Swanson* (1983) 140 Cal.App.3d 571, 574.)

As discussed, Ruiz has not identified a single mitigating factor listed in California Rules of Court, rule 4.423, which he may have argued at sentencing.  A generalized plea for mercy is a request for the trial court to act on arbitrary criteria and personal feelings to reduce a lawful sentence.  In contrast, the trial court noted that the crimes involved separate acts of violence and were committed at different times, both factors supporting the imposition of consecutive sentences pursuant to California Rules of Court, rule 4.425,

subdivision (a).  Nothing in the record indicates that Ruiz's claim of innocence or generalized plea for mercy would have had a reasonable probability of changing the court's sentence.

### III.    The Trial Court Did Not Err in Imposing Fines

Ruiz argues he is indigent, and the imposition of $10,350 in fees and fines violated his due process rights under the federal and state constitutions.  Primarily, we find Ruiz forfeited his challenge to the imposition of fees and fines by failing to object at sentencing.  Likewise, had the claim not been forfeited, we find the fines were not excessive under the Eighth Amendment of the United States Constitution.

### A.  Background

At sentencing, the trial court imposed a $10,000 restitution fine pursuant to section 1202.4, a $150 facilities assessment fee pursuant to Government Code section 70373, and a $200 court operations assessment pursuant to section 1465.8, for a total of $10,350 in fines and fees.  Ruiz did not object and did not request a hearing on his ability to pay the fees.

### B.  Legal Standard

"In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."  (§1202.4, subd. (b).) "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense.  If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." (§ 1202.4, subd. (b)(1).)

"In setting the amount of the fine pursuant to subdivision (b) in excess of the minimum fine pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any

16.

economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or the victim's dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include the defendant's future earning capacity. A defendant shall bear the burden of demonstrating the defendant's inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (§ 1202.4, subd. (d).)

Failure to adduce an inability to pay fines and fees at the trial court forfeits the argument on appeal. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) Ruiz "had a statutory right, and [was] obligated, to object to the imposition of the restitution fines above the $300 minimum. [Citation.] A factual determination was required regarding [his] alleged inability to pay." (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053-1054 (*Lowery*).) Because a challenge to fees and fines is not a pure question of law based on undisputed facts, it cannot be raised for the first time on appeal. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153.)

Ruiz urges this court to apply the reasoning in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) to this case. One published decision of this court has found *Dueñas* wrongly decided. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067 (*Aviles*).) *Aviles* held that we review the imposition of fees, fines and assessments under the "excessive fines" clause of the Eighth Amendment of the United States Constitution. (*Id.* at 1069.) We may review de novo whether a fine is excessive under the Eighth Amendment. (*Id.* at 1072.)

"The Eighth Amendment provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' " (*United States v. Bajakajian* (1998) 524 U.S. 321, 327 (*Bajakajian*).) " '[T]he word "fine" was

17.

understood to mean a payment to a sovereign as punishment for some offense.' " (*Id.* at 328.)

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. [Citations.] … [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." (*Bajakajian*, *supra*, 524 U.S. at p. 334.)

"The California Supreme Court has summarized the factors in *Bajakajian* to determine if a fine is excessive in violation of the Eighth Amendment: '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay. [Citations.]' [Citations.] While ability to pay may be part of the proportionality analysis, it is not the only factor." (*Aviles, supra,* 39 Cal.App.5th at p. 1070.)

## C. Analysis

Ruiz argues that he is indigent, and the fees and fines imposed violate his due process rights. He further argues the issue is cognizable on appeal, because the trial court failed to exercise its discretion and deprived him of fundamental procedural rights, the imposition of the fees and fines was in excess of the trial court's jurisdiction, and trial counsel was ineffective in failing to object to the fees and fines.

It is well established that the imposition of fees and fines is a question of fact, and an appellant is obligated to object at the trial court to the imposition of fines above the minimum amount. (*Lowery, supra,* 43 Cal.App.5th at p. 1054; § 1202.4, subd. (d).) Ruiz bears the burden of proving inability to pay. (§ 1202.4, subd. (d).) Likewise, the record does not show the trial court was unaware of its discretion to impose a lower fine. Error may not be presumed from a silent record, and a trial court is presumed to have been aware of and followed all applicable laws. (*People v. Brown* (2007) 147 Cal.App.4th

1213, 1229.) Ruiz's failure to object to the fees and fines at sentencing forfeited the issue on appeal.

However, even if the issue were not forfeited, the $10,350 in fees and fines imposed do not violate the Eighth Amendment's prohibition against excessive fines. Ruiz was solely culpable for sexually assaulting his nephew and did not provide any mitigating factors to reduce his culpability at sentencing. The jury found Ruiz committed heinous, ongoing acts of sexual assault against an eight-year-old child. Courts have upheld fines as high as $750,000 and $1,000,000 in sexual assault cases. (*People v. Lehman* (2016) 247 Cal.App.4th 795 [upholding a restitution fine of $1,000,000 for ongoing sexual assault of two minors]; *People v. Smith* (2011) 198 Cal.App.4th 415 [upholding a restitution fine of $750,000 for ongoing molestation of a minor.])

The fines imposed are not grossly disproportionate to the heinous nature and gravity of Ruiz's offenses, his level of culpability, and the harm he caused and therefore not excessive under the Eighth Amendment.

## DISPOSITION

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

LEVY, Acting P. J.

PEÑA, J.

19.